CARL V. McGAHEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15447–79, 4435–80.    Filed March 26, 1981.

Carl V. McGahen, pro se.
*Edward J. Laubach, Jr.*, for the respondent.

DAWSON, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioner's Federal income taxes and additions to tax:

| Docket No. | Year | Deficiency | Addition to tax sec. 6653(a)[1] |
|---|---|---|---|
| 15447–79 | 1977 | $8,780.10 | $439.01 |
| 4435–80 | 1978 | 8,760.32 | 438.02 |

The issues presented for decision are:

(1) Whether certain amounts earned by petitioner in 1977 and 1978 are excludable from his gross income because he was a member of a religious order which deemed him to be a "church personally" and which required him to take a vow of poverty and turn over the salary earned in his individual capacity to himself in his church capacity, which church then paid his personal, living, and family expenses.

(2) Whether petitioner is entitled to a charitable deduction under section 170(c) for certain amounts put in the name of Chapter 7807 of the Basic Bible Church.

(3) Whether petitioner is liable for the additions to tax under section 6653(a) for the taxable years 1977 and 1978.

## FINDINGS OF FACT

None of the facts have been stipulated. The cases were tried in Pittsburgh, Pa., on September 16, 1980, at which time testimony was taken and exhibits were received in evidence.

Carl V. McGahen (petitioner) resided in Plumville, Pa., when

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, unless otherwise indicated.

he filed his petitions herein. During the taxable year 1977, various companies employed petitioner as a boilermaker-welder and paid him a total of $29,520.19. He included this amount on his Federal income tax return for 1977 under the item "Wages, salaries, tips and other employee compensation," but later listed the same amount in the space provided for itemized charitable deductions (Form 1040, Schedule A). He then subtracted this figure from his total wages, thus reducing his taxable income shown on the return and tax liability to zero. He stated on the return that the entire income was turned over to the Order of Almighty God, A Religious Order. The same sequence of events occurred for the taxable year 1978 except that the income amount in dispute is $27,880.64. Respondent examined petitioner's 1977 and 1978 income tax returns and determined the deficiencies and additions to tax specified above.

On May 1, 1977, petitioner was ordained a minister, received the degree of doctor of divinty, and was chartered as a subsidiary or auxiliary church of the Basic Bible Church of America.[2] On the same day, he executed a set of bylaws for the

---

[2]The charter provides in part:

CHARTER

Basic Bible Church of America

Mailing Address, P.O. Box 1708, Twin City Airport, Minnesota 55111

Carl V. McGahen, D.D. of

THIS IS TO CERTIFY THAT THE BASIC BIBLE CHURCH OF AMERICA OF BOX 16, Plumville, Pa. 16246 is ordained and established as a subsidiary or auxiliary Church of, and is grated [sic] a Church Charter by, THE BASIC BIBLE CHURCH of AMERICA, Minneapolis, Minnesota, U.S.A., to further the doctrine and principles of the Basic Bible Church in the free exercise of Religion, upon the express agreement of the Trustees of this Auxiliary Church now ordained and established by this Charter to the following terms and conditions; To-Wit:

1. That the Church shall be governed by Three or more Trustees who shall hold all Real and Personal Property in trust, either individually, or as joint tennants [sic] for this Auxiliary Chartered Church. No property will become the property of the parent Church or any other Church unless given by gift or by bequest.

2. This auxiliary Church shall remain unincorporated and no other churches or Orders may be formed by this auxiliary Church.

3. That this Church is organized primarily for Religious, Charitable, Literary and Educational purposes, exclusively.

4. That no part of the earnings of this Church will inure to the benefit of private shareholders or individuals.

\*          \*          \*          \*          \*          \*          \*

20. That the trustees of this Auxiliary Church have no power or authority to charter any other church under this church.

21. That this Auxiliary Chartered Church is not under the management, direction or control of the parent church and therefore the parent church is not liable for any debts, obligations, engagements entered into or liabilities of any kind or nature incurred by the auxiliary church.

22. That likewise, the parent church is not under the control or [sic] the Auxiliary Church in

Order of Almighty God, Chapter 7807 of the Basic Bible Church of America (Chapter 7807). These bylaws[3] provide that petition-

---

any of its business dealings and in so doing business of any kind or nature, the Auxiliary Church is not liable for any debts, obligations or engagements entered into or liabilities of any kind or nature incurred by the Parent Church.

[3]The bylaws provide in part:

ARTICLE III. *Officers.* Officers shall consist of Rev. Carl V. McGahen as head of this Chapter and Donna McGahn [sic] and Owen McGahen as Trustees of this Chapter. The head of the Chapter shall be for life unless otherwise agreed to. The Trustees shall have no right to vote in this Order but shall act in an advisory capacity only.

ARTICLE IV. *Members.* The sole authority of this Chapter of this Order shall be vested in the Head of this Chapter of this Order. All other members of the Chapter of this Order hereby created shall be advisory Trustees, whom the Head of the Order shall listen to for advice, but they shall have no right to vote unless so designated otherwise by the Head of this Order. All members of this Chapter shall be professing, practicing spiritulistic [sic] religion of historic faith in the Basic Bible Church, who have confessed their faith subsequent to their conversion, except that all Children of the Head of this Chapter shall be non voting Trustees. All children of members shall be members without further qualifications until age 25. Membership shall be for life except as otherwise stated or declared by a unaminous vote.

ARTICLE V. *Property.* All property, income, etc., of the Order shall remain property of the Order. In case of dissolution, distribution shall be in accordance with article VI in these By Laws and 26 U.S. Code Section 501(C)(3).

ARTICLE VI. *Legal Tax Exempt Required Statements.* This Order is organized and operated for exclusive religious purposes of the Basic Bible Church. No part of the net earnings of which inures to the benefit of any person or individual, no substantial part of the activities of which is carrying on false propaganda or false statements, or otherwise attempting to influence legislation, and which does not participate in, or intervene in (including the publishing and distributing of statements), any political campaign on behalf of any candidate for public office. Upon the dissolution of the Order, its assets, remaining after payment, or provision for payment of all debts and liabilities of this Order, shall be distributed to a non-profit fund, foundation, or corporation which is organized and operated exclusively for religious purposes and which has established its tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. If this Order holds any assets in trust, such assets shall be disposed of in such a manner as may be directed by decree of the Superior Court of the County in which the Order has its principal office upon Petition of any one lawfully concerned in the liquidation thereof, in a proceeding to which all parties in interest are made parties.

All property is irrevocabley [sic] dedicated to spiritual religious purposes.

ARTICLE VII. *Discipline.* * * *

\*          \*          \*          \*          \*          \*          \*

That the sacerdotal functions performed by this Order shall consist of this dispensation and recieving [sic] of natural vitamins including Vitamin B. 17 or Laetrille in such manner that complies with reason, for the express purposes of healing the sick and injured.

That the Ministers of this Order shall cause their Ministers Certificates to be filed with the proper governmental official or office so that they can perform marriages.

That the head of this Order shall take a vow or [sic] poverty.

That the head of this Chapter of this Order shall have the sole power to control and dispense with the funds and property of this Chapter of this Order for his support to carry out the purposes of the Order, pursuant to 26 U.S. Code Section 501(C)(3).

That the head of this Chapter or Order shall at all times, day and night, on and off the job or at work, shall [sic] engage in distributing material of the Basic Bible Church of America.

That the Head of this Order shall keep a record of all services, meetings held and evangelical work performed and the distribution of materials by the Head of this Order and the Trustees

er is the head of Chapter 7807 and that his wife and brother are the trustees. The trustees have no vote in Chapter 7807 and act only in an advisory capacity.

Although the head of Chapter 7807 must take a vow of poverty, he retains the power to hold, control, and dispense the funds and property of the chapter.

On May 2, 1971, petitioner executed a notarized vow of poverty which states in part:

Therefore, I Rev. Carl V. McGahen of the City of Plumville, County of Indiana State of Pennsylvania hereby make an irrevocable gift of all my possessions, real, personal, choses in action and otherwise and all my income whatsoever, regardless of the form of the income, to the Church, and/or, Order herein named, thus divesting myself of all my possessions and income whatsoever to be used for Religious purposes to support the basic Biblical Law of the Church or Order hereinafter named. All such possessions and Income in any, hereinafter being the property of the said Church or Order regardless of whether or not they continue to appear in my personal name. I further understand that outside employment renumeration [sic] (when directed by the Church or Order) is not personal income, but rather income by gift from the begining [sic] to the Church or Order and not of the individual or undersigned.

The Church or Order designated to receive said Income and possessions is a religious Order of the Basic Bible Church of America, Minneapolis, Minnesota, designated as THE ORDER OF ALMIGHTY GOD: CHAPTER NO. 7807.

---

designated by him and other chruch [sic] workers for inspection by Jerome Daly, Chief of the Order and Vice President of the Basic Bible Church or to the person so designated by Jerome Daly.

That all information and communications by and between all members of this Order shall be had and kept in strict confidence and is [sic] to be considered priviledged and all agree to keep it secret.

Necessary disbursments [sic] paid by the Head of this Order to himself and his trustees shall be determined by the Head of this Order and Jerome Daly nor his delegate has any right to dictate the management, control or disbursments [sic] of monies or the disposition of any property.

VIII. *Title to Property.* All property, real, personal and otherwise shall be held by the person signing and agreeing to these By-Laws as the "Head" of this Order. The Head of this Order shall designate who shall succeed him as "Head" of this Order and shall designate the distribution of the property in the event of his death to one or more Orders set up, or to be set up similar to this Order. The property shall be held in the same manner as if this were a Common Law Trust according to 26 U.S. Code Section 501(C)(3).

IX. *Purposes of Order's Property.* This Order is not organized or operated for the benefit of any Private Interests, or other designated interests or individuals, or persons controlled, directly or indirectly, by such private interests. * * *

Other than the above signed vow of poverty, petitioner made no legal transfer of the deed to his home[4] or the title of his motor vehicles to Chapter 7807.

On or about this same time, petitioner received a letter from Jerome Daly, Archbishop of the Basic Bible Church of America, which stated, in part:

3. This Church and Order is founded on the beliefs and teachings contained in the Holy Bible and other sacred scripture, The Declaration of Independence and the Constitution of the U.S. and upon the principle that a man owns his own life and is bound by the sacred natural Law Golden Rule, "DO UNTO OTHERS AS YOU WOULD HAVE THEM DO UNTO YOU."

You are directed and required, as a part of the duties of this Order, to become employed in gainful [sic] employment, and to use the renumeration [sic] gained therefrom and your occupation as a Boilermaker Welder—— whereever [sic] assigned by the Union., as a vehicle and instrument to carry out and put into effect the principles of the Church and Order. In order to persuade and encourage other people to practice and apply this Church's Creed and philosophy and teachings to their social, private and business activities and also to the mental and spiritual sector of their lives you are to constantly set a good example by the practice of these principles and creed yourself.

4. You are directed and required to become employed and to keep employment and productive work in order to earn income to spend and use to support yourself, your family and other church members and workers and you are to use your job and employment as a vehicle to carry out the purposes of this Church and Order.

5. You are directed to use the income of the Order and Church as you see fit and reasonable to carry out the purposes of the Order.

6. You are at all times, on and off the job and work, to carry out the duties of an evangelist and on a 24 hour basis you are to direct and promote the principles and creed of this Church and Order.

Both before and after his ordination petitioner worked as a boilermaker-welder for various corporations.[5] His wife, who filed separately, worked as a waitress. After petitioner's ordination, they put their joint earnings in a checking account in the name of the Basic Bible Church of America, Chapter 7807, from which they could withdraw funds. With the creation of this church account, petitioner and his wife abandoned their then-existing joint personal checking account and thereafter used the

---

[4]The record is silent as to whether petitioner held the home in his own name or in joint tenancy with his wife, who did not take a vow of poverty.

[5]On his 1977 tax return, petitioner did not separate his preordination and postordination income and expenses. Because the parties have not addressed this issue and because of our holding herein, we will not discuss it further.

church account for the same purposes as their prior joint checking account. Some of his wife's earnings were used to buy groceries for the family; however, petitioner did not know how much she earned in 1977 and 1978, nor the extent of her financial contributions to household expenses. During 1977 and 1978, petitioner and his wife used the funds in the Chapter 7807 checking account to support their children, to pay mortgage installments on the house in which they lived, his union dues, certain taxes, repair bills, gasoline, and insurance premiums for his motor vehicles. He kept no records of how much was withdrawn from the checking account but admitted that most of the $29,520.19 earned in 1977 and the $27,880.64 earned in 1978 was consumed.

Petitioner made approximately 20 trips to Basic Bible College in Beaver, Pa. over 2 years to attend classes on the fundamentals of his religion. Each trip lasted 1 or 2 days. After his ordination, petitioner preached and had a Sunday school. He kept no list of people who attended Chapter 7807.

Petitioner could remember only two individuals who attended the Chapter 7807 meetings, and they were other Basic Bible Church ministers. He did try to solicit new members where he was employed but did not advertise services in the local newspaper, nor did he list Chapter 7807 in the local telephone directory. He performed no baptisms, confirmations, or funeral services.

Jerome Daly, as archbishop and president of the Basic Bible Church of America, ordained petitioner into the Basic Bible Church, and established him as a subsidiary or auxiliary church, Chapter 7807 of the parent church. Religious worship consisted of meditation, preaching on the job, passing out church pamphlets and sacraments, and setting a good example for fellow employees. Mr. Daly explained that the fundamental creeds of the Basic Bible Church are that a person's mind is the person's own church and his body is the temple and that this church did not support itself by begging for donations, but rather by the labor of its ministers. He elaborated that a Basic Bible Church minister was a "church personally" and, as a church, cannot exist in a vacuum; the minister "has to support himself and his family as a church personally and support his parsonage and support his work as a church personally and support the religious preaching

and the ministration of sacramental functions and the conduct of religious worship of himself as a church personally."

Raymond M. Hartman is a bishop of the Basic Bible Church of America and dean of the Basic Bible College and the Life Science College.[6] He explained the dogmas and beliefs of the Basic Bible Church and that each minister is an individual church in convention with the other churches of the Basic Bible Church; that a chapter does not solicit moneys or donations from the general public to support church work; that each chapter ministered religiously as a church personally through funds earned from secular employment and assigned back to the chapter; that the functions of the church were to be carried out on a 24-hour-a-day basis; that all funds produced from secular jobs were to be used exclusively for religious purposes; and that each minister commissioned as a church personally has to take a vow of poverty and deliver his worldly property and possessions and any salary earned from secular labor to the church.

## OPINION

Section 61 states the general rule that, except as otherwise provided by law, gross income includes all income from whatever source derived. Section 61(a)(1) specifically includes compensation for services as an income item. Section 1.61–2(c), Income Tax Regs., provides that when, pursuant to an agreement, services are rendered to a third party for the benefit of a religious or charitable organization described in section 170(c), and money is paid by the third party to the organization, then the amount so paid is income to the person performing the services. An individual who turns over his entire annual income to a church is still taxable on that income, subject to the deduction allowed for charitable contributions. *Riker v. Commissioner*, 244 F.2d 220 (9th Cir. 1957), affg. T.C. Memo. 1955–225, cert. denied 355 U.S. 839 (1957).

---

[6]Mr. Hartman's testimony was taken during the trial of Daryl B. Hall, docket No. 16170–79, T.C. Memo. 1981–143, which occurred on the same trial calendar as petitioner's case and involved similar issues. By order of the Court dated Sept. 16, 1980, following petitioner's oral motion, Mr. Hartman's testimony was made a part of the record in petitioner's cases.

Petitioner argues that he is a "church personally,"[7] namely Basic Bible Church, Chapter 7807, and that Chapter 7807 qualified under section 501(c)(3)[8] as a tax-exempt organization. He states that he, as an individual, has taken a vow of poverty and was directed by his archbishop, Jerome Daly, to obtain work as a boilermaker and then turn his salary over to Chapter 7807, i.e., himself as a church personally. The church, in turn, supports petitioner and his family, and pays the mortgage, union dues, food bills, and other personal expenses.

Respondent has observed that petitioner, in filling out his 1977 and 1978 Federal income tax returns, wrote in the space provided for itemized charitable deductions (Form 1040, Schedule A) amounts assigned to Basic Bible Church, Chapter 7807, equal to his reported income for the respective years and thus showed a taxable income and income tax liability in the amount of zero for each year.[9] Therefore, respondent contends that (1) petitioner is not entitled to an itemized charitable deduction under section 170 because Chapter 7807 does not qualify as a religious or charitable organization under section 170(c)(2) since it was not operated exclusively for religious or charitable purposes and it violated the prohibition against net earnings inuring to the benefit of any private shareholder or individual;[10]

---

[7]We note that this is not a declaratory judgment action brought pursuant to sec. 7428 to determine the tax-exempt status of a religious organization. The deficiency was determined against petitioner as an individual.

[8]Sec. 501(a) provides in part:

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

Sec. 501(c)(3) provides in part:

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

*   *   *   *   *   *   *

(3) Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *

[9]On brief, petitioner states that he filled out the return in this manner because he did not know any other way to claim tax-exempt status as a "church personally."

[10]Sec. 170 provides in part:

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

*   *   *   *   *   *   *

and (2) that the petitioner never made a gift of his annual earnings to Chapter 7807 during 1977 and 1978.

Petitioner relies on O.D. 119, 1 C.B. 82 (1919), and Rev. Rul. 66–219, 1966–2 C.B. 208, as authority against respondent's determination of deficiencies. O.D. 119 states:

A clergyman is not liable for any income tax on the amount received by him during the year from the parish of which he is in charge, provided that he turns over to the religious order of which he is a member, all the money received in excess of his actual living expenses, on account of the vow of poverty which he has taken.

Members of religious orders are subject to tax upon taxable income, if any, received by them individually, but are not subject to tax on income received by them merely as agents of the orders of which they are members.

Rev. Rul. 66–219 states:

An organization, which otherwise meets the requirements for qualification for exemption from Federal income tax as an organization described in section 501(c)(3) of the Internal Revenue Code of 1954, will not be precluded from establishing an exempt status under section 501(a) of the Code merely because the creator of the organization (if a trust) is either the sole or controlling trustee or merely because the organization is controlled by one individual. But see sections 503 and 504 of the Code, providing for denial of exemption of certain organizations described in section 501(c)(3) of the Code because the organization has engaged in a prohibited transaction * * * or because of the

---

(b) PERCENTAGE LIMITATIONS.—

(1) INDIVIDUALS.—In the case of an individual, the deduction provided in subsection (a) shall be limited as provided in the succeeding subparagraphs.

(A) GENERAL RULE.—Any charitable contribution to—

(i) a church or a convention or association of churches,

\*      \*      \*      \*      \*      \*      \*

shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year.

\*      \*      \*      \*      \*      \*      \*

(E) CONTRIBUTION BASE DEFINED.—For purposes of this section, the term "contribution base" means adjusted gross income (computed without regard to any net operating loss carryback to the taxable year under section 172).

\*      \*      \*      \*      \*      \*      \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\*      \*      \*      \*      \*      \*      \*

(2) A corporation * * *

\*      \*      \*      \*      \*      \*      \*

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * *

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; * * *

nonuse or misuse * * * of amounts accumulated out of income for purposes or functions constituting the basis for exemption of the organization under section 501(a) of the Code.

O.D. 119 is not an unqualified license exempting all clergy and religious organizations from income taxes in all circumstances. A member of a religious order under a vow of poverty is not immune from Federal income tax by reason of his clerical status or his vow of poverty, but is subject to tax to the same extent as any other person on income earned or received in his *individual* capacity. *Kelley v. Commissioner*, 62 T.C. 131 (1974); Rev. Rul. 77-290, 1977-2 C.B. 26.

In *Kelley v. Commissioner, supra,* the taxpayer was a Roman Catholic priest and a member of the Dominican Order. He took a vow of poverty renouncing all temporal goods and declaring that any income which might accrue to him, individually, belonged to the Dominican Order. In the taxable year in question, he received wages for teaching at a Catholic college and a non-Catholic college and received commissions for selling securities. During this time, he lived in his own apartment, used his salary to support himself, and generally conducted himself as a layman. He argued that he was acting as an agent of the Dominican Order when he received the amounts in issue; that he was subject to his vow of poverty; that the Order knew where he was working and living and his approximate salary; and that he received these amounts directly to avoid the unnecessary step of giving the funds to the Order and then having the Order return them to him to allow him to pay his living expenses. We found that he was not an agent of the Order, but rather that he was living apart from the Order and earning a salary which he used to support himself, pay his rent, make car loan payments, buy his own food and clothes, and start a small savings account. There were no limitations or restrictions on the use of his earnings. He never made any accounting to the Order of what he earned or how he spent those earnings. Although he made a vow of poverty, the manner in which he handled his economic and financial affairs indicated that such vow was not fulfilled in practice. Accordingly, we held that the amounts involved were taxable income to him.

When an agent receives income for a principal, it is the income of the principal, not the agent. *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920). Likewise, when a member of a

religious order receives income on behalf of that order and, pursuant to a vow of poverty, turns it over to the order, it is the income of the order and not the member. Where, however, there is no agent-principal relationship, it is a basic rule of tax law that an assignment by a taxpayer of compensation for services to another person is ineffectual to relieve the taxpayer of Federal income tax liability on such compensation regardless of the motivation behind the assignment. *Lucas v. Earl*, 281 U.S. 111 (1930). See also *Helvering v. Horst*, 311 U.S. 112 (1940); *Helvering v. Eubank*, 311 U.S. 122 (1940). This is where petitioner's argument collapses. The income received by him was not received on behalf of a separate and distinct principal, but was received by him in his individual capacity. Although he made a vow of poverty, the manner in which he handled his economic and financial affairs was the same as it was before he was ordained and chartered as a "church personally." He had no limitations on the use of his earnings. There was no accounting to assure the frugal and ascetic life of one who takes a vow of poverty of what was earned and how it was spent. Chapter 7807 was an attempt at creating an "incorporated pocketbook." See *Helvering v. Clifford*, 309 U.S. 331 (1940). Clearly, petitioner earned his wages in his individual capacity.

Under the structure of the Basic Bible Church and by its bylaws and charter, petitioner could not be an agent of the church. The documentary evidence submitted in this case and the testimony of the president and archbishop of the Basic Bible Church demonstrate that in its institutional framework, the Basic Bible Church merges the traditional separation between the secular and the sacerdotal, between the individual wage earner and the corporate entity of a section 501(c)(3) organization. Even for an organization claiming the benefits of section 501(c)(3) as a religious organization, "tax exemption is a privilege, a matter of grace rather than right." *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 857 (10th Cir. 1972), cert. denied 414 U.S. 864 (1973). The Basic Bible Church may arrange its financial activities in any manner without restraint, subject, however, to withholding of the exemption or, in the alternative, it may refrain from such activities and obtain the privilege of exemption. Petitioner struggles to escape the tax liability on his individual income under section 61 and to avoid the prohibition of section 262

against decreasing the income subject to tax by amounts paid for personal, living, and family expenses by "incorporating" himself into a church, which, for all practical purposes, goes out into the secular world, earns income, and engages in temporal and business affairs. By doctrinal definition of the Basic Bible Church, petitioner attempts to transmute the commercial into the ecclesiastical and thus avoid the congressional separation of taxable individual income and tax-exempt religious order income. This is not permitted. *Riker v. Commissioner, supra; Parker v. Commissioner*, 365 F.2d 792 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967); *Hofer v. United States*, 64 Ct. Cl. 672, 6 AFTR 7379, 1 USTC par. 287 (1928); *First Libertarian Church v. Commissioner*, 74 T.C. 396 (1980); *Christian Manner International, Inc. v. Commissioner*, 71 T.C. 661 (1979). Therefore, the income he earned was as an individual and not as an agent of Chapter 7807 and must be included in his income.[11]

Petitioner's second argument is that because his employment as a boilermaker is an integral part of his religious activity and is essential to manifest fully his religious beliefs and to carry on his duties as a minister of the Basic Bible Church, and because he was directed by his ecclesiastical superiors to seek such employment and use it to engage in the ministry of Basic Bible Church sacerdotal functions, all income derived from such employment was exempt from taxation by virtue of section 3401(a)(9). Section 3401(a)(9) is a part of chapter 24 of the Internal Revenue Code of 1954. Chapter 24 relates to the collection of income taxes on wages at the source, i.e., the requirement of withholding. See sec. 3402. Section 3401(a)(9) provides:

(a) WAGES.—*For purposes of this chapter*, the term "wages" means all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash; except that such term shall not include remuneration paid—

\*      \*      \*      \*      \*      \*      \*

(9) for services performed by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order * * *
[Emphasis added.]

---

[11]See also *Young v. Commissioner*, T.C. Memo. 1981–109; *Lysiak v. Commissioner*, T.C. Memo. 1981–108; *Lynch v. Commissioner*, T.C. Memo. 1980–464.

Petitioner seriously misplaces reliance on section 3401(a)(9). Whether Federal income taxes must be withheld at the source is entirely a separate issue from whether taxes must ultimately be paid on income. Compare section 63 with section 3402.

Having concluded that petitioner must include as income the salary he earned during the years 1977 and 1978, we will now consider whether he is entitled to a deduction under section 170(c) for the amounts he claimed he turned over to the Basic Bible Church, Chapter 7807. We observe first that petitioner listed in the space provided for charitable contributions on his 1977 and 1978 (Form 1040 Schedule A) amounts equal to his entire income for each year. Section 170(b)(1)(A)(i) limits the charitable deduction available to an individual to 50 percent of the individual's contribution base which section 170(b)(1)(E) defines to be adjusted gross income without regard to any net operating loss carryback. Thus, our discussion herein will relate only to the amounts qualifying for the deduction and not the entire salary for each year. Petitioner has not raised any argument at trial or on brief regarding entitlement to the section 170(c) deduction but because of the equivocal manner in which he filled out his Federal income tax returns for 1977 and 1978 and because respondent has briefed this issue, we will address the charitable deduction question.

In order for petitioner to be allowed a charitable contribution deduction for the amounts he claims were turned over to Chapter 7807, he must prove that the recipient qualified under section 170(c)(2). Although the parent organization, the Basic Bible Church of America, has been granted tax-exempt status under section 501(c)(3), Chapter 7807 has an existence legally separate and distinct from the parent church. *Basic Bible Church v. Commissioner*, 74 T.C. 846 (1980). Petitioner's charter[12] specifically states that Chapter 7807 is "not under the management, direction or control of the parent church and therefore the parent church is not liable for any debts, obligations, engagements entered into or liabilities of any kind or nature incurred by the auxiliary church." In addition, the charter provides that no property of the auxiliary church belongs to the parent church.

---

[12]See note 2 *supra.*

One of the requirements for qualification under section 170(c)(2) is that no part of the net earnings of the religious or charitable organization inure to the benefit of any private shareholder or individual. Sec. 170(c)(2)(C). Even if the benefit inuring to the members is small, it is still impermissible. *Unitary Mission Church of Long Island v. Commissioner*, 74 T.C. 507, 513 (1980), affd. 647 F.2d 163 (2d Cir. 1981); *Beth-El Ministries, Inc. v. United States*, an unreported case (D. D.C. 1979, 44 AFTR 2d 5190, 79-2 USTC par. 941).

Although the charter and bylaws of Chapter 7807 contain paragraphs which recite the inurement prohibition of section 170(c)(2), other provisions in these documents and the doctrine of the Basic Bible Church sanction the petitioner's use of chapter funds to pay for his own personal, living, and family expenses. First, the bylaws state that the head of the chapter (the petitioner as ordained and established as a "church personally") holds title to all real and personal property of Chapter 7807. The charter, however, indicates that the trustees hold all real and personal property of the chapter, but the bylaws limit the power of the trustees to an advisory capacity only. Second, the bylaws specifically state that the head of the Chapter has "sole power to control and dispense with the funds and property of this Chapter of this Order for his support." This sentence in the bylaws also refers to the purposes of the Order as being pursuant to section 501(c)(3), but the reference does not shelter petitioner from the prohibitions against personal inurement. Rev. Rul. 66-219, *supra*, states that an organization *which otherwise meets* the qualification status will not be precluded from establishing its eligibility under section 501(c)(3) because it is controlled by one individual or its creator is the sole or controlling trustee. We interpret this ruling to mean that eligibility will not necessarily be denied where one individual controls the application of the organization's funds *for religious purposes*, but certainly a revenue ruling cannot grant exception to the statutory prohibition against the inurement of the organization's funds *for personal purposes*. Such circumstances where a single individual controls the use of the organization's funds for his own and his family's support require close scrutiny to determine if there has been a violation of the private inurement prohibition of section 170(c)(2) or section 501(c)(3). Third, the petitioner testified that he used the funds in the Chapter 7807 checking account to pay

his personal, living, and family expenses including mortgage payments, union dues, taxes, gasoline, motor vehicle upkeep and insurance, and support of his children. He further testified that nearly all of his wages which he deposited in the account were withdrawn by him for the above uses. Accordingly, we hold that the petitioner is not entitled to any charitable deduction for amounts purportedly transferred to Chapter 7807. *Church of the Transfiguring Spirit, Inc. v. Commissioner*, 76 T.C. 1 (1981); *People of God Community v. Commissioner*, 75 T.C. 127 (1980); *Southern Church of Universal Brotherhood Assembled, Inc. v. Commissioner*, 74 T.C. 1223 (1980); *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 74 T.C. 531 (1980); *Western Catholic Church v. Commissioner*, 73 T.C. 196 (1979), affd. without published opinion 631 F.2d 736 (7th Cir. 1980), cert. denied 450 U.S. 981 (1981).

Because of our holding herein we need not address respondent's other arguments to the effect that (1) petitioner never made a gift or contribution of his wages to Chapter 7807 because he continued to maintain dominion and control over the amounts after their purported transfer and used such funds to pay his own personal, living, and family expenses during 1977 and 1978 in the same manner as he had done prior to the alleged conveyance,[13] and (2) Chapter 7807 did not qualify as a charitable organization because it was not operated exclusively for religious or charitable purposes under section 170(c)(2)(B).[14]

Although the facts of this case might justify the imposition of additions to tax under section 6653(b) for underpayments due to fraud,[15] respondent has determined for the taxable years 1977

---

[13]See, e.g., *Manson v. Commissioner*, T.C. Memo. 1980–315; *Abney v. Commissioner*, T.C. Memo. 1980–27; *Calvin K. of Oakknoll v. Commissioner*, T.C. Memo. 1978–336.

[14]See, e.g., *Schoger Foundation v. Commissioner*, 76 T.C. 379 (1981); *Basic Bible Church v. Commissioner*, 74 T.C. 846 (1980); *General Conference of the Free Church of America v. Commissioner*, 71 T.C. 920 (1979); *Church in Boston v. Commissioner*, 71 T.C. 102 (1978); *Baker v. Commissioner*, T.C. Memo. 1980–367; *Pusch v. Commissioner*, T.C. Memo. 1980–4, affd. by unpublished order (5th Cir., Oct. 3, 1980), cert. denied 450 U.S. 930 (1981); *Clippinger v. Commissioner*, T.C. Memo. 1978–107.

[15]Cf. *United States v. Hudler*, 605 F.2d 488 (10th Cir. 1979), cert. denied 445 U.S. 961 (1980), wherein the Court of Appeals affirmed the conviction and sentence of 1-year imprisonment after the taxpayer had been found guilty of violating sec. 7205 by willfully supplying false information to two employers. He submitted to his employers Internal Revenue Forms W–4 on which he falsely claimed 99 withholding exemptions, believing that he was exempt from withholding under sec. 3401(a)(9) which excludes, from wages, remuneration received by an ordained minister in the exercise of his ministry and by a member of a religious order in the

and 1978 only the additions to tax under section 6653(a) for underpayment due to negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proving that the underpayment was not due to negligence or intentional disregard of the rules and regulations. *Axelrod v. Commissioner*, 56 T.C. 248, 258 (1971). He presented no evidence on this issue. Consequently, the section 6653(a) additions to tax are sustained.[16]

*Decision will be entered for the respondent.*

---

performance of duties required by that order. He testified he was a minister of the Universal Sanctuary of the Association of Jesus Christ of the United States of America, the Order of Almighty God, and had taken a vow of poverty and conveyed all his property to the church. He continued his previous employment and deposited his wage checks in a bank account on which he and his wife could draw. His church superiors told him how to stop the withholding of taxes by claiming 99 withholding exemptions on his W–4. The Circuit Court affirmed the jury's verdict that the taxpayer's act was sufficient to constitute willfulness under the criminal law. See also *United States v. Peister*, 631 F.2d 658 (10th Cir. 1980).

[16]In cases of this type, an award of damages under sec. 6673 may be in order under appropriate circumstances. Certainly the evidence herein suggests that Chapter 7807 was merely a tax-avoidance device whereby the petitioner hoped to insulate his wages from taxation and yet use such wages to pay for his personal living expenses. In addition, we note that Jerome Daly and Raymond Hartman, the individuals who are promoting and encouraging this tax-avoidance device and who testified for the petitioner at the trial, are the same persons who have previously made meritless constitutional attacks on the Federal income tax laws. See *United States v. Daly*, 481 F.2d 28 (8th Cir. 1973), cert. denied 414 U.S. 1064 (1973); *Hartman v. Commissioner*, 65 T.C. 542 (1975); *Hartman v. Commissioner*, T.C. Memo. 1977–63, affd. in unpublished opinion (3d Cir., June 10, 1977).