MELVIN L. KRAUSE AND KATHRYN KRAUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MELVIN L. KRAUSE AND KATHRYN A. KRAUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krause v. Commissioner
Docket Nos. 28229-81, 12920-83.
United States Tax Court
T.C. Memo 1987-193; 1987 Tax Ct. Memo LEXIS 193; 53 T.C.M. (CCH) 589; T.C.M. (RIA) 87193; April 13, 1987. Joseph Weigel, for the petitioners. Sheldon M. Kay, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined deficiencies and an addition to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6651(a) [1]
1977
$2,157.00
1978
3,115.00
1979
3,424.00
$386.80
1980
2,328.00
1981
1,916.00
The issues for decision are: 1) whether petitioners are entitled to claimed charitable contribution deductions to the Life Science Church of Cosmas and Damian; 2) whether petitioners are entitled to claimed charitable contributions to miscellaneous organizations; 3) whether petitioners are entitled to deduct expenses incurred in sponsoring their son's golfing activities; and 4) whether the section 6651(a)(1) addition to tax applies for the year 1979. For convenience, we have combined our findings of fact and opinion by issues. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and *196 the attached exhibits are incorporated by this reference. Charitable Contributions to the Life Science Church
FINDINGS OF FACT On their 1977 Federal individual income tax return, petitioners deducted $10,141.50 as a charitable contribution to the "Life Science Church of Cosmas and Damian," (LSC of C&D) an organization originally known as the "Order of Almighty God Chapter 11006." The registrar of deeds for Marathon County, Wisconsin recorded the following document: LIFE SCIENCE CHURCH OF COSMAS & DAMIAN, P.O. Box 3, Mosinee, Wisconsin 54455 9 February 1976 TO WHOM IT MAY CONCERN: KNOW ALL MEN BY THESE PRESENTS: That the undersigned R. David Pennings, Kathryn Stockheimer, Maxine Pennings, Joan Cimino and John M. Couture and those who are or may become associated with them for the purposes herein specified have organized themselves into a religious society of the Life Science Church of Cosmas and Damian, located in Mosinee, in the County of Marathon, and State of Wisconsin, for religious, educational, charitable and scientific purposes, which society shall be known and incorporated by the name of the Life Science Church of Cosmas and Damian. * * * Ralph Pennings, *197 head of the Order of Almighty God Chapter 11006/LSC of C&D, and Jerome Daly, president of the Life Science Church of Bloomington, Minnesota and minister of the Basic Bible Church of America, signed the bylaws of the Life Science Church of Cosmas and Damian. Said bylaws provided, inter alia, the following: BY-LAWS [sic] OF "THE ORDER OF ALMIGHTY GOD", CHAPTER 11006, UNDER THE DIRECTION OF THE LIFE SCIENCE CHURCH OF BLOOMINGTON, MINNESOTA. PREAMBLE: These By-Laws [sic] are adopted by the Order in consonance with the purposes of the LIFE SCIENCE CHURCH OF BLOOMINGTON, MINNESOTA, a Division of the Basic Bible Church of America, a/k/a Basic Bible Church Inc. of Minnesota, * * *. Article I. Designation. This Order is named, THE ORDER OF ALMIGHTY GOD", Chapter 11006, of the LIFE SCIENCE CHURCH OF BLOOMINGTON, MINNESOTA. * * * Article III. Officers. Officers shall consist of R. David Pennings as head of this Chapter and Maxine Pennings, Kathryn Stockheimer, Frank A. Bartus as Trustees of this Chapter. The head of the Chapter shall be for life unless otherwise agreed to. The Trustees shall have no right to vote in this Order but shall act in an advisory capacity *198 only. Article IV. Members. The sole authority of this Chapter of this Order shall be vested in the Head of this Chapter of this Order[.] All other members of the Chapter of this Order hereby created shall be advisory Trustees, whom the Head of the Order shall listen to for advice, but they shall have no right to vote unless so designated otherwise by the Head of this Order. All members of this Chapter shall be professing, practicing spiritu[a]listic religion of historic faith in the Life Science Church, who have confessed their faith subsequent to their conversion, except that all Children of the Head of this Chapter shall be non voting Trustees. All children of members shall be members without further qualifications until age 25. Membership shall be for life except as otherwise stated or declared by a unaminous [sic] vote. Article V. Property. All property, income, etc., of the Order shall remain property of the Order. In case of dissolution, distribution shall be in accordance with article VI. [sic] in these By Laws [sic] and 26 U.S. Code Section 501(c)(3). Article VI. Legal Tax Exempt Required Statements. This Order is organized and operated for *199 exclusive religious purposes of the Life Science Church. No part of the net earnings of which inures to the benefit of any person or individual, no substantial part of the activities of which is carrying on false propaganda or false statements, or otherwise attempting to influence legislation, and which does not participate in, or intervene in (including the publishing and distributing of statements), any political campaign on behalf of any candidate for public office. Upon the dissolution of the Order, its assets, remaining after payment, or provision for payment of all debts and liabilities of this Order, shall be distributed to a non-profit fund, foundation, or corporation which is organized and operated exclusively for religious purposes and which has established its tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. If this Order holds any assets in trust, such assets shall be disposed of in such a manner as may be directed by decree of the Superior Court of the County in which the Order has its principal office upon Petition of any one lawfully concerned in the liquidation thereof, in a proceeding to which all parties in interest *200 are made parties. All property is irrevocabley [sic] dedicated to spiritual religious purposes. Article VII. Discipline. * * * That the sacerdotal functions performed by this order shall consist of this dispensation and receiving of natural vitamins including B. 17 or Laetrille [sic] in such manner that complies with reason, for the express purposes of healing the sick and injured. * * * That the head of this Chapter of this Order shall have the sole power to control and dispense with the funds and property of this Chapter of this Order for his support to carry out the purposes of the Order, pursuant to 26 U.S. Code Section 501(c)(3). * * * Necessary disbursements paid by the Head of this Order to himself and his trustees shall be determined by the Head of this Order[,] and Jerome Daly nor his delegate has any right to dictate the management, control or disbursements of monies or the disposition of any property. VIII. TITLE TO PROPERTY All property, real, personal and otherwise shall be held by the person signing and agreeing to these By-Laws [sic] as the "Head" of this Order. The Head of this Order shall designate who shall succeed him as "Head" *201 of this Order and shall designate the distribution of the property in the event of his death to one or more Orders set up, or to be set up similar to this Order. The property shall be held in the same manner as if this were a Common Law Trust, according to 26 U.S. Code Section 501(c)(3). IX. PURPOSES OF ORDER'S PROPERTY This Order is not organized or operated for the benefit of any Private Interests, or other designated interests or individuals, or persons controlled, directly or indirectly, by such private interests. * * * XI. RESPONSIBILITY FOR LIABILITIES That Jerome Daly, as Chief of the Order, President of the Life Science Church, or otherwise, is not responsible for any of the debts, obligations, liabilities or engagements entered into by the Head of this Order or any of its Trustees and, the opposite is true, neither is the Head of this Order responsible for any debts, obligations or liabilities or engagements that may be incurred by Jerome Daly in any capacity and each agree that each will hold the other harmless. * * * The LSC of C&D manufactured Laetrile. One of its "sacerdotal functions" was the "dispensation and receiving of natural Vitamins, including *202 Vitamin B 17 or Laetrile," and Pioneer Laboratories, a branch of the LSC of C&D, was to manufacture, prepare, test, distribute and export Laetrile. Ralph Pennings received from a LSC of C&D bank account funds which were used to maintain part of his personal living expenses. The State of Wisconsin exempted the LSC of C&D from the state sales tax. Wisconsin subsequently revoked said exemption because it determined that the LSC of C&D did not qualify as an exempt organization. OPINION Section 170(a) provides that one may deduct amounts paid as a "charitable contribution." Section 170(c) defines the term "charitable contribution" as follows: (c) Charitable Contribution Defined. -- For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of --- * * * (2) A corporation, trust, or community chest, fund, or foundation --- * * * (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve[s] the provision of athletic facilities or equipment), or for the *203 prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; * * * Petitioners contend that the LSC of C&D is a qualified recipient because it is part of the Basic Bible Church, an organization that has been granted tax-exempt status. Petitioners, however, must show, inter alia, that the LSC of C&D is not separate from its purported parent church. In the present case, Article V of the LSC of C&D's bylaws provided that all its property was to remain the property of the LSC of C&D, not the Basic Bible Church of America. Article VIII of the bylaws provided that all of the property of the LSC of C&D must be held by the head of the order, i.e., David Pennings. Article XI of the bylaws provided that Jerome Daly, minister of the Basic Bible Church of America, was not responsible for any of the debts, obligations, liabilities, or engagements into which David Pennings entered, and David Pennings was not responsible for any of the debts, obligations, liabilities, or engagements into which Jerome Daly entered. We find that the LSC of C&D is "separate and distinct from its parent church." The Basic Bible Church v. Commissioner,74 T.C. 846, 855 (1980). *204 As a separate entity, we further find that the LSC of C&D is not a qualified recipient pursuant to section 170(c). An LSC of C&D bank account provided funds for Ralph Pennings' personal living expenses. The LSC of C&D bylaws stated that the head of the chapter, i.e., Ralph Pennings, held title to all real and personal property of said chapter and that the head of the chapter had "sole power to control and dispense with the funds and property of this Chapter of this Order for his support." We find that the net earnings of the LSC of C&D inured to the benefit of David Pennings. See McGahen v. Commissioner,76 T.C. 468, 482 (1981), affd. without published opinion 702 F.2d 664 (3d Cir. 1983) and the cases cited therein. Petitioners cite the document, which the registrar of deeds for Marathon County, Wisconsin filed, and the LSC of C&D bylaws to establish that the LSC of C&D was organized for religious, education, charitable, and scientific purposes and required to conduct religious services. The language in these documents is self-serving, does not establish how the organization operated and does not vitiate our finding that the net earnings of the *205 LSC of C&D inured to the benefit of David Pennings. Petitioners also state that the LSC of C&D "applied for an[d] received tax-exempt status from the State of Wisconsin." This fact is not relevant. First, said document involves a statesales tax, not a Federalincome tax. Furthermore, the State of Wisconin subsequently revoked said document because it determined that the LSC of C&D was not an exempt organization. [2]
Accordingly, we hold that the LSC of C&D was not a qualified recipient pursuant to section 170(c). Charitable Contributions to Miscellaneous Organizations
FINDINGS OF FACT In a notice of deficiency, respondent disallowed charitable contribution deductions, which petitioners claimed on their 1977 and 1978 Federal individual income tax returns, as follows: YEAR
DONEE
AMOUNT
1977
Life Science Church of America
$15
1977
Rev. Richard Reese
100
1977
Radio Bible Class
10
1977
Jack Van Impe
10
1977
American Legion
50
1978
Robert Schuller
10
1978
American Conservative Union
25
1978
American Legion
10
1978
Rev. T. Thompson
50
1978
Rev. I. Gould
50
1978
Pennsacola Singers
20
1978
Rev. R. Reece
100
1978
Pastor R. Reece
50
*206 OPINION Petitioners have the burden of proof to establish that they are entitled to their claimed charitable contributions. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners have offered no evidence with respect to these contributions. Accordingly, respondent's determination is sustained. Welch v. Helvering,supra.
Golf Sponsorship Expenses
FINDINGS OF FACT Petitioner husband owns a retail lumber, hardware, and buildings supplies store, is a general contractor, and owns a self-service gas "outlet." During the years in issue, petitioners sponsored their son's, Peter Krause's, golfing activities. Petitioners did not sponsor any other golfers or professional athlete before, during, or after the time during which they sponsored their son. Peter Krause, an avid golfer, has been playing golf since he was 10 years old. He attended college at Baylor University where he was captain of the golf team and a medalist in some of their tournaments. He entered numerous amateur tournaments including the "Cherryland Open," the "Twin Cities Open," which he won twice, and a Greenbay, Wisconsin *207 tournament in which he finished in second place. After graduating from college, Peter Krause decided to "turn pro." On November 1, 1976, November 2, 1976 and January 4, 1981, Peter Krause and petitioners, i.e., his parents, entered into golf sponsorship contracts which were substantially similar to the following: GOLF CONTRACT The party of Mr. and Mrs. Melvin L. Krause have entered this agreement with golf professional Peter Krause in his endeavor to pursue a career as a golf professional. The duration of this contract will be on a yearly basis starting on Nov 1, 1976 to Dec 31, 1977. From this point on, the word sponsor will refer to Mr. and Mrs. Melvin L. Krause and the word player will refer to Peter Krause. The sponsor and the player have agreed on the following provisions in which they will conduct their business relationship. 1. The sponsor will incur all entry fees, living expenses, transportation to and from tournament sites, equipment expenses and any other expenses incurred by the player. It will be the player[']s responsibility to keep a record of all expenses incurred. 2. Money from the sponsor to the player will be given prior to each tournament or tournament *208 series in the form of traveler checks or money deposited in the player's checking account. If circumstances beyond the player's control occur during a tournament, the player may request for additional funds. 3. Prize money won by the player will be shared with the sponsor on a 60-40 percentage basis with 60% going to the player and 40% to the sponsor. The two parties will adhere to this arrangement until the player has paid back the sponsor his original investment. After that, any and all prize money won by the player will be shared on an 80-20 percent basis. 80 percent would go to the player and 20 percent to the sponsor. 4. Prize money won by the player will be sent back to the sponsor where the sponsor will divide the money accordingly. After having read the above provisions, we the undersigned are in complete agreement and do hereby enter this business endeavor with great enthusiasm and anticipation. SPONSOR: (Signed) Melvin L. Krause
(Signed) Kathryn A. Krause
PLAYER: (Signed) Peter Krause
ACCEPTED: NOV 2, 1976
During 1976 through 1981, Peter Krause played in golf tournaments as follows: POTENTIAL
YEAR
TOUR
PLACE
CLUB
EARNINGS
National Golfers
1976
of America
Phoenix, Az
McCormack Ranch
$6,000
National Golfers
1976
of America
Phoenix, Az
San Marcos
$6,000
National Golfers
1976
of America
Phoenix, Az
Rio Verde
$6,000
American Golf
1977
Tour
Orlando, Fla
Cypress Creek
5,000
American Golf
1977
Tour
Jacksonville, Fla
The Dunes
5,000
American Golf
1977
Tour
Panama City, Fla
Bay Point C.C.
5,000
American Golf
1977
Tour
San Antonio, Tx
Pecan Valley
5,000
American Golf
1977
Tour
Austin, Tx
Lakeway Gold Club
5,000
American Golf
1977
Tour
Midland, Tx
Midland Municipal
5,000
American Golf
1977
Tour
Lubbock, Tx
Lubbock C.C.
5,000
American Golf
1977
Tour
Kansas City, Ks
Oakwood C.C.
5,000
American Golf
1977
Tour
Indianapolis, Ind
Golf Club of Ind.
5,000
American Golf
1977
Tour
Apopka, Fla
Errol Estate
3,000
American Golf
1977
Tour
Haines City, Fla
Greneiefe
3,000
American Golf
1977
Tour
Phoenix, Az
McCormack Ranch
6,000
American Golf
1977
Tour
Phoenix, Az
San Marcos, C.C.
6,000
American Golf
1977
Tour
Phoenix, Az
Rio Verde
6,000
Nat'l Golfers
1978
of America
Casa Grande, Az
Casa Granda C.C.
3,000
Nat'l Golfers
1978
of America
Phoenix, Az
San Marco
3,000
Nat'l Golfers
1978
of America
San Diego, Ca
San Vicente C.C.
2,500
Space Coast
1978
Golf Tour
Orlando, Fla
Poinciana G.C.
4,500
Space Coast
1978
Golf Tour
Apopka, Fla
Errol Estate
4,500
Space Coast
1978
Golf Tour
Deltona, Fla
Deltona G.C.
4,500
Space Coast
1978
Golf Tour
Orlando, Fla
Orange Tree C.C.
4,500
P.G.A. Tour
1978
Qualifying
Lebanon, Ind
Gold Club or Inc.
1,500
P.G.A. Tour
1978
Qualifying
Yankton, S.D.
Yankton C.C.
4,000
1978
Wis. State Open
Green Bay, Wis.
Oneida C.C.
1,500
1978
Cherryland Open
Sturgeon Bay, Wis
Alpine G.C.
500
Indian Hills
1978
Pro-Am
St. Paul, Minn.
Indian Hills
1,000
1978
Arrowhead Pro-Am
Rapid City, S.D.
Arrowhead, C.C.
3,000
Nat'l Golfers
1978
of America
Phoenix, Az
Rio Verde
6,000
Nat'l Golfers
1978
of America
Phoenix, Az
San Marcos
6,000
Nat'l Golfers
1978
of America
Phoenix, Az
McCormack Ranch
6,000
Space Coast
1979
Golf Tour
Orlando, Fla
Orange Tree
4,500
Space Coast
1979
Golf Tour
Deltona, Fla
Deltona G.C.
4,500
Space Coast
1979
Golf Tour
Kissimmee, Fla
Poinciana
4,500
Space Coast
1979
Golf Tour
Titusville, Fla
Royal Oak
4,500
U.S. Open
1979
Qualifying
Milwaukee, Wis
Tripoli
50,000
Nat'l Golfers
1979
of America
Phoenix, Az
Goodyear C.C.
4,000
Nat'l Golfers
1979
of America
Phoenix, Az
Goodyear C.C.
4,000
Nat'l Golfers
1979
of America
Phoenix, Az
Rio Verde
4,000
Nat'l Golfers
1979
of America
Phoenix, Az
Biltmore C.C.
4,000
1979
Cherryland Open
Sturgeon Bay, Wis
Maxwelton Braio
1,000
Bogey Hills
1979
Pro Am
St. Louis, Mo
Bogey Hills C.C.
3,500
Indian Hills
1979
Pro Am
St. Paul, Minn
Indian Hills
1,000
1979
Arrowhead Pro Am
Rapid City, S.S.
Arrowhead, C.C.
4,500
Space Coast
1979
Gold Tour
Orlando, Fla
Cypress Creek
5,000
Space Coast
1979
Gold Tour
Ocala, Fla
Silver Springs
Shores
5,000
Space Coast
1979
Gold Tour
Titusville, Fla
Royal Oak
5,000
Space Coast
1979
Gold Tour
Orlando, Fla
Alhambra G.C.
5,000
Space Coast
1979
Gold Tour
Kissimmee, Fla
Poinciana
5,000
Grand Nat'l Golf
1980
Tour Qualifying
Las Vegas, Nev
Tropicana C.C.
3,000
Nat'l Golfers
1980
of America
Huntsville, Tx
Waterwood Nat'l
5,000
Nat'l Golfers
1980
of America
Huntsville, Tx
Waterwood Nat'l
5,000
Nat'l Golfers
1980
of America
Huntsville, Tx
Elkins Lake
5,000
Nat'l Golfers
1980
of America
Huntsville, Tx
Texas Nat'l
5,000
U.S. Open
1980
Qualifying
Milwaukee, Wis
Merrill Hills
54,000
1980
Yankton Pro Am
Yankton, S.D.
Yankton C.C.
5,000
1980
Reid Pro Am
Appleton, Wis.
Reid Municipal
1,000
Westward Ho
1980
Pro Am
Sioux Falls, S.D.
Westward Ho C.C.
3,000
1980
Wis State Open
Milwaukee, Wis.
Milwaukee, C.C.
2,500
Indian Hills
1980
Pro Am
St. Paul, Minn
Indian Hills
1,500
1980
Arrowhead Pro Am
Rapid City, S.D.
Arrowhead C.C.
5,000
Bogey Hills
1980
Pro Am
St. Louis, Mo
Bogey Hills C.C.
4,500
Space Coast
1980
Golf Tour
Titusville, Fla
Royal Oak
5,500
Space Coast
1981
Golf Tour
Orlando, Fla
Tuscawilla G.C.
5,500
Space Coast
1981
Golf Tour
Deltona, Fla
Deltona G.C.
5,500
Space Coast
1981
Golf Tour
Titusville, Fla
Royal Oak
5,500
Space Coast
1981
Golf Tour
Kissimmee, Fla
Poinciana
5,500
Space Coast
1981
Golf Tour
Sun City, Fla
Walden Lakes
5,500
Space Coast
1981
Golf Tour
Daytona Beach, Fla
Club Indigo
5,500
Byron Nelson
1981
Qualifying
Dallas, Tx
Shores C.C.
54,000
*209 Peter Krause won money at said tournaments as follows: Year
Amount
1976
$ 0
1977
0
1978
300
1979
1,940
1980
1,150
1981
0
TOTAL
$3,390
Petitioners did not receive any of the money, which Peter Krause won, or report any gross income from their son's golfing activities. Petitioner wife kept a record of the sponsorship expenses which she and her husband incurred. Petitioners deducted golf sponsorship expenses as follows: Year
Amount
1977
$ 4,815.09
1978
14,150.54
1979
15,080.87
1980
11,983.00
1981
9,559.00
TOTAL
$55,588.50
OPINION Section 183(a) provides generally, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided for in that section. Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable * * * under section 162 or * * * paragraph (1) or (2) of section 212." [3] The resolution of the issue is to be based on all the facts and circumstances. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). In order for the taxpayer to prevail, the facts *210 and circumstances must indicate that the taxpayer entered into, or continued, the activity with an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In the present case, petitioners did not carry on their activity, i.e., their sponsorship, in a business-like manner. Although *211 petitioners and their son entered into "golf contracts," the parties failed to respect the terms of said contracts. The November 1 and November 2, 1976 contracts provided that Peter Krause was to send the prize money, which he won, to petitioners, and petitioners were to divide said money pursuant to the terms of the contract. [4] Peter Krause won $300 in 1978, $1,940 in 1979, and $1,150 in 1980. He, however, did not send any money to his parents, and his parents did not report any gross income from their son's golfing activities. This failure weighs heavily against petitioners. Without adherence to the terms of the agreement, petitioners would not receive any income and would never have a profit. Petitioners contend that they carried on their sponsorship in a business-like manner because petitioner wife kept records of the sponsorship. Although petitioner wife did keep records of the expenses, which she and her husband incurred, these records alone do not persuade us. The records make no reference to the amount of money which their son won, or the amount of money to which they were entitled. Petitioners' *212 only concern appears to be the amounts which they could deduct. Petitioners did not sponsor any other professional athlete prior to, during, or after their son's sponsorship. They sponsored only their son, and said sponsorship proved to be quite unprofitable. Petitioners sustained losses of $4,815.09, $14,150.54, $15,080.87, $11,983.00, and $9,559.00 in the years 1977, 1978, 1979, 1980, and 1981, respectively. Petitioners never had a profit, and their total reported gross income was $0. Petitioners contend that no unfavorable presumption should arise because they sponsored their son. They further contend that the Internal Revenue Service would not have questioned their profit motive if "the golf pro's name were Arnold Palmer or Joe Blow," instead of Peter Krause, their son's name. Although one may reasonably infer from the familial arrangement that petitioners sponsored their son in part, if not totally, for family loyalty and personal pleasure, the record contains no such evidence. However, regardless of the name of the golfer whom petitioners sponsored, petitioners failed to respect the terms of the golf contracts, received no money from Peter Krause -- even though he won *213 over $3,000, reported no gross income, and deducted over $15,000 in deductions/losses. Based on this record, petitioners' sponsorship of Peter Krause was not engaged in for profit. Section 6651(a)(1) Addition to Tax
FINDINGS OF FACT Petitioners filed their 1979 Federal individual income tax return on April 5, 1981. OPINION Section 6072(a) provides that income tax returns made on the basis of a calendar year shall be filed on or before the 15th day of April following the close of the calendar year. Section 6651(a)(1) imposes an addition to tax if a return is not filed on the date prescribed (determined with regard to any extension of time for filing) unless it is shown that such failure is due to reasonable cause and not due to willful neglect. In the present case, petitioners filed their 1979 return on April 5, 1981, almost one full year after April 15, 1980, the date by which petitioners should have filed their return. They have presented no evidence that the late filing was due to reasonable cause and not due to willful neglect. Accordingly, respondent's determination is sustained. Decisions will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. Because we have found that the net earnings of the LSC of C&D inured to David Pennings' benefit, we need not decide respondent's alternative argument that the LSC of C&D illegally manufactured Laetrile and, therefore, public policy would be frustrated if we allowed petitioners to deduct the payments to the LSC of C&D.↩
3. Section 1.183-2(b), Income Tax Regs., provides a list of nine factors to consider in the determination of whether an activity is engaged in for profit. Said factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.↩
4. The January 4, 1981 contract did not contain this provision.↩