KATHLEEN M. JENNY and JULIUS R. JENNY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jenny v. Commissioner
Docket No. 13274-80.
United States Tax Court
T.C. Memo 1983-1; 1983 Tax Ct. Memo LEXIS 786; 45 T.C.M. (CCH) 440; T.C.M. (RIA) 83001; January 3, 1983. Kathleen M. Jenny and Julius R. Jenny, pro se. Edward J. Laubach, Jr., for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654 [1]
1975 [2]
$7,731.22
$3,865.61
$332.02
1976
3,669.70
1,834.85
1977 [2]
5,355.57
2,677.79
191.98
*791 The issues for decision are: 1) whether respondent's deficiency notice for the years 1975 and 1977 was arbitrary and capricious requiring its dismissal or the shifting of the burden of proof, 2) whether in the years 1975 through 1977, Julius R. Jenny was liable for income and self-employment taxes on insurance commissions earned by him as an alleged agent for a purported church, 3) whether in the years 1975 through 1977 petitioners are entitled to deduct various business expenses and itemized deductions, 4) whether in the years 1975 and 1976 petitioners are entitled to deduct losses incurred in their operation of a dog kennel, 5) whether in each of the years 1975 and 1976 petitioners are entitled to a $1,000 loss carryover deduction, 6) whether in the years 1975 and 1977, Julius R. Jenny was required to report one-half the income of a trust set up by his uncle distributed to petitioners jointly, 7) whether in the year 1976, petitioners properly deducted $7,250 as a contribution to a purported church, 8) whether Julius R. Jenny is liable for the fraud additions under section 6653(b) in each of the years at issue, 9) whether Kathleen M. Jenny is liable for the fraud addition for the *792 year 1976, 10) whether Julius R. Jenny is liable for the additions to tax under section 6654 for failure to pay estimated income taxes in 1975 and 1977, and 11) whether petitioners are entitled to costs of this action. If the additions to tax for fraud are not upheld for the years 1975 and 1977, respondent, in the alternative, asserts Julius R. Jenny is liable for the following additions to tax: Year
Sec. 6653(a)
Sec. 6651(a)
1975
$386.56
$1,932.81
1977
267.78
1,338.89
FINDINGS OF FACT Petitioners Julius R. and Kathleen M. Jenny, husband and wife, resided at Darlington, Pennsylvania, at the time the petition was filed. Julius Jenny graduated from high school and completed two semesters of college at Duquesne University. Prior to 1975, he was for many years president and sole owner of a Dodge dealership known as Dick Jenny Dodge, Inc. In the more than 20 years of his working life prior to 1975 he had always filed Federal income tax returns. Kathleen M. Jenny ("Mrs. Jenny") was a graduate of Virginia Intermont College. She took continuing education courses at the University of Pittsburgh, Youngstown State University and Geneva College. She attended *793 nursing school at Bristol, Virginia, and worked as a registered nurse in a Pennsylvania hospital until March, 1975. At that time, Mrs. Jenny quit the nursing profession because of her opposition to abortion. For at least the three years prior to 1975, Mrs. Jenny filed joint income tax returns with her husband. Between January, 1975, and July, 1977, Julius Jenny sold disability insurance policies to self-employed individuals as an independent contractor for Shook Associates Corporation and R.L. Shook & Associates of Ohio, Inc. In his dealings with these two corporations, Jenny never stated he was performing his services as or on behalf of a church and he always included his own individual name on the line for the selling agent on insurance contracts he solicited. During the years 1975 through 1977, he received Forms 1099 from these corporations showing the following commission income: 1975
1976
1977
Shook Associates Corp.
$5,064.71
$7,919.41
$483.63
R.L. Shook & Associates of Ohio, Inc.
22,075.21
16,515.29
23,527.19
These forms also showed $1,025.45 in 1975 and $212.48 in 1976 as prizes and awards from Shook Associates Corporation. The $1,025.45 *794 prize in 1975 represented the cost of a one week all-expense paid trip to Nassau, Bahamas, awarded to Mr. Jenny for his successful insurance salesmanship. Although a few brief meetings occurred in Nassau in connection with company business on this trip, the trip was primarily a personal vacation. During the years 1975 through 1977, both petitioners operated a dog kennel business, Fur N' Feather Kennel. Services provided by the kennel included: boarding of dogs for people going on vacation, grooming of dogs for appearance, obedience training, treatment of animal skin, eye or ear problems and breeding of dogs for future sale (particularly German short-haired pointers and Weimaraners). It is unclear from the record when this kennel began operation. However, during the entire course of its existence, which terminated in 1978, the kennel never showed a profit. On their "amended 1975 return," petitioners reported $1,168.60 of gross receipts from the kennel, but overall a $3,943.35 net loss. Among the deductions claimed on the Schedule C on that "return" were $1,004 for show expenses and $862.59 for vehicle expenses. These last two items represented the costs of taking several *795 of petitioners' dogs to regional dog shows where the top cash prize for the best dog in the show ranged from $25 to $100.Petitioners never won any prize for their dogs. On their 1976 joint return, petitioners reported $2,482.50 of gross receipts from their kennel, a kennel net loss of $5,178.91 and show-related expenses, as follows: Show Expense
$ 641
Vehicle Expense
1,566
Professional Handler
Fees
876
Total
$3,083
Prior to opening the kennels, petitioners made no inquiry into the profitability of such a venture. Petitioners were not, in fact, interested in making a profit from the kennels, but merely hoped it would eventually be self-sustaining. Petitioners had owned dogs during their entire married life and enjoyed working with animals. Mrs. Jenny had taken several educational courses regarding the care of animals. The kennel's services were advertised in local newspapers and phone directories. The kennel charged fees based on the the size of the dog, but did not charge some customers due to their inability to pay. Records of the kennel were kept in a small ledger book. A separate checking account for the kennel was maintained. During 1975 and *796 through 1977, petitioners were joint income beneficiaries of the Erwin J. Hainisch Trust. Erwin J. Hainisch was Mr. Jenny's uncle. In 1975, petitioners jointly received a taxable trust distribution of $4,915.94. On February 6, 1976, the bank acting as trustee of this trust informed petitioners by letter that the above amount should be included in their 1975 return. Sometime prior to April, 1976, Julius Jenny met with Jerome Daly ("Daly") and William Drexler ("Drexler"). At several meetings, Jenny learned of the latter two men's activities in resisting the collection of Federal income taxes on the grounds that Federal reserve notes are not lawful money and that the requirement for the filing of a tax return unconstitutionally deprives citizens of their protection against self-incrimination. In late 1975, Jenny also learned of Daly's Basic Bible Church. On April 12, 1976, Julius Jenny signed and mailed to the Internal Revenue Service a Form 1040, purporting to be a return for the taxable year 1975 for an individual claiming "married filing separately" status. On this Form 1040, Jenny reported his income from wages to be "under" $740 "expressed in Constitutional Dollars of *797 silver and/or gold." The remaining entries on the return were all filled with either zeros or asterisks indicating Jenny's objection to answering the questions asked "on grounds of the 1st, 4th, 5th, 7th, 8th, 9th, 10th, 13th, 14th, and 16th Amendments, as to Federal Reserve Notes." Attached to this purported return were 154 pages of supplementary documents consisting of Jenny's constitutional objections (particularly the 5th Amendment), his arguments based on the Coinage Act of 1792 that Federal Reserve Notes are not lawful money, articles on abusive Internal Revenue Service procedures and "bureaucratic boondoggling" with taxpayers' money, excerpts from numerous court opinions and anti-abortion literature. Also contained in these documents were an Internal Revenue Service internal memorandum from the Regional Commissioner of the Western Region instructing his subordinates on how to process "Fifth Amendment Tax Protester Returns" and an attached from letter to be sent to such protesters pointing out that a document which does not contain any information relating to the taxpayer's income from which the tax can be computed is not a return within the meaning of the Internal Revenue *798 Code (citing and directing the taxpayer to United States v. Porth,426 F.2d 519 (10th Cir. 1970)). The documents also contained several newspaper articles referring to Daly and Drexler as disbarred attorneys and noting the former's conviction and the latter's acquittal for willful failure to file income tax returns. Jenny purchased some of these documents from Drexler, but compiled the rest of the documents himself. Jenny filed this set of documents primarily to protest Federal support of abortion. The documents nowhere refer to a church or Jenny's being a minister. Jenny later told an I.R.S. Special Agent that there was no connection between this 1975 "return" and the later 1976 and 1977 "church" returns. For the taxable year 1975, Mrs. Jenny filed a Form 1040A as a married individual filing separately. On this return she reported $3,044.31 of income from the Medical Center of Beaver County, Inc. She reported no other income or deductions and paid total taxes of $167. Although supportive of her husband's abortion protest, after some discussion she chose not to file jointly with her husband that year. On December 6, 1975, petitioners signed a document *799 entitled "Constitution and Bylaws of the Life Science Church -- of Darlington." The Life Science Churches operate as auxiliaries or subsidiaries of the Basic Bible Churches. The Basic Bible Church's main chapter was first established and controlled by Daly. Daly sold petitioners this document and ordained Julius Jenny as a minister for $300. The Constitution and Bylaws of the Life Science Church of Darlington (the "Church") provided, in pertinent part, as follows: The Church was to have its offices at petitioners' residence in Darlington, Pennsylvania. The Church was to be governed by a Board of Directors. There were to be not less than three directors and a majority of directors constituted a quorum. The Board was granted authority to issue memberships in the Church and elect its officers. Members were entitled to vote for directors and transact other business at annual and special meetings. The President was to be chief executive officer of the Church with the power to carry out the Board of Director's resolutions and generally to manage and act on behalf of the Church. The Treasurer of the Church was to be responsible for disbursing all Church funds, and checks were *800 to be signed by both the President and Treasurer. Julius Jenny signed this document as President; Mrs. Jenny as Secretary. No Treasurer apparently was ever appointed. Two other individuals, described by petitioners as "trustees," were also affiliated with the Church: Jay Jackson (a friend and neighbor of petitioners) and Richard E. Jenny (one of petitioners' three minor children). Meetings of these four "trustees" were held monthly, or approximately so, in 1976 and 1977, at which time Mr. Jenny's activities and expenditures of Church funds were reviewed and ratified by majority vote. According to a pamphlet distributed by petitioners on behalf of the Church, the basic doctrines, principles and beliefs of the Church are the Declaration of Independence and the Constitution (with the exception of the 16th and 25th Amendments). Prior to March 8, 1976, petitioners maintained a joint bank account, out of which they paid their personal living expenses, at the First National Bank, East Palestine, Ohio.On March 8, 1976, petitioners closed out this account and deposited all its funds into a new account at the same bank in the name of the Life Science Church of Darlington. Mr. and *801 Mrs. Jenny were the only signatories on this new account.The two other so-called Church trustees were not signatories. In May, 1977, fearing the confusion of their Church with different Churches of similar names, petitioners changed the name of their Church to the Basic Bible Church of America, Chapter 7813. As part of this name change, petitioners closed out the checking account in the Church's old name and opened a new account with the same funds and authorized signatories under the new name. Also, at this time, the four trustees of petitioners' Church signed a new charter and bylaws of the Church as the Basic Bible Church of America, Chapter 7813. The preprinted bylaws are identical to those set out in pertinent part in the Findings of Facts of McGahen v. Commissioner,76 T.C. 468, 470 n.2 (1981), on appeal (3d Cir., Aug. 24, 1981), except for the Chapter number, the location of the Church (here, petitioners' residence) and the Officers of the Church. In these new bylaws, Julius Jenny was named head of the Church with all management powers and Mrs. Jenny, Richard Jenny and Jay Jackson were named trustees with advisory powers only. No substantive changes *802 in the doctrines, operations, governance or membership in the Church occurred as a result of this name change. Throughout the Church's existence, petitioners have employed the funds in its accounts to purchase groceries, clothing and other personal living items for their own use. Petitioners' living style did not materially change after the Church was organized. At some point, the petitioners transferred the title to their home and automobiles into the Church's name. Additionally, petitioners deposited all monies received from Shook Associates Corporation and R.L. Shock & Associates of Ohio, Inc. into the Church's checking accounts. For the taxable year 1976, petitioners timely filed a joint income tax return.On this return, petitioners reported $24,647.18 of Schedule C income for the Life Science Church of Darlington. This amount represented the total prizes and commission payments received by Julius Jenny from Shook Associates Corporation and R.L. Shock & Associates of Ohio, Inc. in that year.Petitioners reported a net income from this business of $19,017.03 after claiming several business expenses, including: $150 of legal and professional fees, $51.80 of auto rental *803 expenses (which were also deducted a second time as part of a $3,786.29 auto expense business deduction) and $638.10 of promotional-entertainment expenses. On this return, petitioners also reported a separate Schedule C business net loss for Fur N' Feather Kennel of $5,178.91 and income from the Erwin Hainisch Trust of $1,610.44. They claimed a $1,000 capital loss carryover deduction. The above income and loss items (together with $55.12 of reported interest income) produced an adjusted gross income figure of $14,503.68. On their Schedule A itemized deductions, petitioners claimed roughly one-half this adjusted gross income figure, $7,250, as a deductible cash contribution to the Life Science Church of Darlington. Both petitioners had discussed the appropriateness of claiming this contribution deduction before filing the return.Another itemized deduction claimed by petitioners was an $821.72 medical expense deduction. Still another itemized deduction was for $2,442.30 of interest expenses on home mortgage and car loans, which interest payments were made out of Church funds. The home and cars at that time were owned by the Church. These various claimed itemized deductions *804 and personal exemptions reduced petitioners' taxable income to zero. Finally, on their 1976 return, petitioners claimed an exemption from self-employment taxes. For the taxable year 1977, Julius Jenny mailed to the Internal Revenue Service a Form 1040 on which he included his name, address, social security number and signature. None of the other lines on the form were filled in. On the bottom of the second page of the Form, petitioner typed the following: "NOTE: I have taken a Vow of Poverty (copy attached) and am, therefore, exempt from Federal Income Tax and FICA Tax." The attached, notarized vow of poverty, dated May 5, 1977, declared that the petitioner made an irrevocable gift of all his possessions, then owned or to be acquired in the future, as well as all his income to the Church. The preprinted vow stated, "I further understand that outside employment remuneration (when directed by the Church or Order is not personal income, but ruather [sic] income by gift from the beginning to the Church or Order and not of the individual or undersigned." Daly countersigned this vow of poverty as Bishop of the Basic Bible Church, purporting to have directed Jenny to execute it. *805 During 1976 and 1977, both petitioners continued to maintain wills, though they did not have wills at the time of trial.
In late 1978 and early 1979, Julius Jenny was the subject of a criminal investigation by the Internal Revenue Service for the taxable years 1975 through 1977. Although at times cooperative in producing records, Jenny very often refused to provide the investigators with documents, contending they were Church property and therefore privileged from examination. In particular, Jenny refused to show the investigators any records of checks for the taxable year 1977. In the course of the above investigation, the possibility of filing an amended return for the taxable year 1975 was discussed between petitioner and the Special Agents. After completion of the criminal investigation and while a civil audit was still in progress, on April 7, 1979, petitioners filed a document purporting to be an amended joint tax return for the taxable year 1975. On the Form 1040, Schedule C, petitioners reported $28,165.37 of gross receipts from Julius Jenny's insurance business. This amount represented the total commissions and prizes received that year from Shook Associates Corporation *806 and R.L. Shook & Associates of Ohio, Inc. Petitioners claimed various business deductions totaling $7,440.32 in connection with this activity, including a $4,926 auto expense deduction, an $832.25 promotional and entertainment expense deduction and a $736.64 office expense deduction. On the amended 1975 Form 1040, petitioners also reported as income Mrs. Jenny's $3,044.31 of wages and the full $4,915.94 of trust distributions both petitioners received in 1975. Petitioners claimed a Schedule C loss for their kennel operation of $3,943.35 and a $1,000 capital loss carryover. Petitioners computed their tax on the basis of five personal exemptions (one for each of the petitioners and their three minor children), the married filing jointly tax tables and itemized deductions of $5,462.78. The petitioners made no reference to a church on these forms, except that petitioners did claim exemption from the self-employment tax, stating that a Form 4029 was filed and pending. The amended Form 1040 showed $2,724.27 of taxes due for the taxable year 1975. Petitioners, however, did not pay any of this amount to the Internal Revenue Service at the time they filed these forms. On April 14, 1980, respondent *807 mailed two separate statutory notices of deficiency to petitioners. The first notice was addressed to Julius Jenny only and pertained to the taxable years 1975 and 1977. This deficiency notice determined that Julius Jenny had not filed any returns for the taxable years 1975 and 1977. Consequently, respondent reconstructed petitioner's 1975 and 1977 income and deductions using the best available evidence and treating Jenny as a married person filing separately. For the 1975 taxable year, respondent determined Julius Jenny had gross receipts of $28,165.37 from his insurance business and $4,933.08 of allowable business deductions. In determining the allowable business deductions, respondent's agent relied on the figures on the purported joint 1975 amended return, except that he did not allow: 1) a $191.60 tolls and parking deduction claimed as an auto expense (on the grounds that the same amount was claimed again as a tolls and parking deduction further down the Schedule C), 2) $909.10 of auto expense deductions (on the grounds that these were airfare, meals, lodging and babysitting expenses connected with petitioner's Bahamas vacation) and 3) an $832.25 promotion and entertainment *808 expense deduction (on the grounds of lack of substantiation). For 1975, respondent further determined that Julius Jenny was required to report as income one-half of the trust distributions he received jointly with his wife that year ($2,457.97). Respondent did not include in his reconstructed return any itemized deductions from the purported amended return because he could not determine which deductions were attributable to Mrs. Jenny and which to Mr. Jenny. Respondent did not allow petitioners a $1,000 capital loss carryover on grounds of lack of substantiation. Respondent determined no income nor allowed any deductions attributable to the Fur N'Feather Kennel. Respondent determined that Mr. Jenny was entitled to exemptions for himself and his three children and was liable for the self-employment tax. For the taxable year 1977, respondent again reconstructed a married person filing separately return for Julius Jenny, including as income the amounts received from Shook Associates Corporation and R.L. Shook & Associates of Ohio, Inc. and one-half of the Hainisch Trust distribution for 1977. Due to Jenny's lack of cooperation in the production of his business records for 1977 *809 and in light of the fact Jenny only worked full-time in the insurance business for the first seven months of 1977, respondent allowed Jenny an estimated 1977 insurance business deduction of 7/12 of his allowable 1976 business deductions. From third party sources, respondent determined that Jenny was entitled to $1,717.31 of itemized deductions. Jenny was allowed four personal exemptions. Respondent also imposed the self-employment tax.
The deficiency notice for the taxable year 1976 concerned both petitioners. In this notice, respondent disallowed the following claimed items: 1) a $51.80 auto rental business expense deduction (on the grounds it was already claimed in a separate auto expense deduction), 2) a $150 legal and professional fee business expense deduction (on the grounds it was not shown to be an ordinary and necessary business expense), 3) a $5,178.91 net loss on Fur N' Feather Kennel (on the grounds that the kennel was not an activity entered into for profit within the meaning of section 183), 4) a $1,000 capital loss carryover (on the grounds of lack of substantiation), 5) a $7,250 charitable contribution deduction to the Life Science Church of Darlington (on the grounds *810 no contribution was actually made and that in any event section 170 did not allow the deduction), 6) a $638.10 business deduction for promotional and entertainment expenses, and 7) $261.40 of medical expense deductions (on the grounds that a math error had been committed and further adjustments were required because of the increase in petitioners' adjusted gross income). Respondent further imposed the self-employment tax. OPINION As a preliminary matter, certain evidentiary matters require a brief discussion. Prior to the trial of this case, petitioners refused to enter into serious discussion with respondent's counsel for the purpose of stipulating relevant facts as required by Rule 91, and as a consequence respondent served petitioners with written interrogatories and a request for the production of documents, both designed to elicit relevant facts in preparation for trial. When petitioners failed (in respondent's judgment) to adequately respond to same, respondent moved to compel responses or to impose sanctions under Rule 104. Two hearings on this motion were held by the trial judge in Washington, D.C., at neither of which did the petitioners adequately respond to the *811 government's motion. Notwithstanding petitioners' flagrant disregard of the Court's Rules and the Trial Judge's directions to respond, the motion was continued to the subsequent commencement of the trial of the case in Pittsburgh, Pennsylvania. When the case was called for trial, petitioners (who were not represented by counsel) were afforded a final opportunity to respond to the motion, but refused to do so on the apparent theory that since they, the petitioners, were a church, the information sought was privileged. The information sought related to various theretofore unsubstantiated itemized and business expense deductions claimed by petitioners individually for 1975 and 1976, and income and expense items claimed by them for such years in connection with a dog kennel operated by petitioners but at the trial claimed by petitioners to be owned and operated by them as a church. After an extended colloquy between petitioner Julius Jenny, respondent's counsel and the Court, the Court read into the record the inadequately answered part of respondent's interrogatories, item by item, and petitioners' responses thereto, and as to each item of the interrogatories to which petitioners *812 had failed properly to respond ruled that petitioner would be precluded from introducing evidence thereon. See Rule 104. [3] The evidence precluded is discussed in further detail, infra.
*813 The first issue for decision is whether the respondent's notice of deficiency for the taxable years 1975 and 1977 was arbitrary and erroneous. Petitioners argue that because the deficiency notice proceeds on the assumption that no return was filed for 1975, whereas an amended return for 1975 was in fact filed, respondent's determination is arbitrary and erroneous and should be dismissed as to both years. Alternatively, petitioners argue that the burden of proof for these years should be shifted to respondent. We find no merit in petitioners' arguments. Regardless of whether the deficiency notice proceeds on the basis of a valid return having been filed for 1975, the record as a whole in this case amply supports the conclusion that the deficiency notice was not based upon arbitrary or capricious action by the respondent, and we so hold. Helvering v. Taylor,293 U.S. 507 (1935). This case by no stretch of the imagination presents one of those "rare occasions" where this Court will look behind the deficiency notice to examine the propriety of the Commissioner's administrative policy or procedure in making his determination. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974), *814 and cases of similar import too numerous to cite. We therefore decline to "dismiss" respondent's determination for 1975 and 1977 or to shift the burden of proof to respondent for those years. The next issue for decision is whether Julius Jenny is liable for income taxes in 1975 and 1977 and liable for self-employment taxes in 1975, 1976 and 1977 on his insurance commission and prize income.
We first observe that petitioners have not validly elected joint return treatment for 1975. Mrs. Jenny originally filed a separate return for 1975, whereas, as discussed infra, the document originally filed by Julius Jenny for 1975 did not constitute a valid return. Section 6013(b), the relevant parts of which are reproduced in the margin, 3a permits taxpayers to "make a joint return" after an individual return has been filed (as in Mrs. Jenny's case) if certain prerequisites have been met. Among other things, section 6013(b)(2) precludes the making of a joint return election "unless there is paid in full at or before the time of the filing of the joint return the amount shown as tax upon such joint return." Section 6013(b)(2)(A). Since, as we have found as a fact, such condition was *815 not met, the Jennys did not make a valid joint return election for 1975. Consequently, respondent properly determined Julius Jenny's tax liability separately for 1975. *816 Although Julius Jenny's initial 1975 Form 1040 raised several unfocused constitutional arguments and arguments against the issuance of Federal Reserve Notes, petitioner does not pursue those largely frivolous arguments here. It is presently petitioner's position that he is not liable for income taxes or self-employment taxes on his insurance commission income in 1975, 1976 and 1977 on the grounds that he personally was a church in those years. Petitioner argues that the church earned the income as part of its charitable mission and that petitioner's laboring was at the direction of and as agent for the church. We disagree. In McGahen v. Commissioner,76 T.C. 468 (1981) on appeal (3rd Cir., Aug. 24, 1981), we reviewed in detail each of the arguments presented by petitioner. McGahen involved a Basic Bible Church minister who also claimed 1) to be a church personally, 2) to have earned monies at the direction of and as an agent for his church and 3) to have executed a vow of proverty assigning all his income to the church. In regard to income taxes, we held that the taxpayer's personal receipt of the income combined with his unfettered use of such funds to *817 pay his living expenses vitiated any argument that he operated as an agent for the church. Accordingly, the taxpayer was required to pay income taxes on the full amount of income earned by him as a boilermaker-welder. Petitioner's situation in the instance case is indistinguishable, except for his line of work, from that of the taxpayer in McGahen. In both cases the taxpayers received monies from their employers, individually and without restriction as compensation for services rendered. In both cases the taxpayers deposited those funds in "church" checking accounts over which they had unfettered use. In both cases the taxpayers used these church funds as a source of payment of personal expenses. Under such circumstances, and for the reasons appearing in McGahen, we hold petitioner was the earner of the insurance commission and prize income and was required to pay income tax thereon during the years before the Court. [4] See also Stephenson v. Commissioner, 79 T.C.     (No. 63) (December 13, 1982). *818 Indeed, petitioner's position in the instant case is even less tenable than that of the taxpayer in McGahen. First, there is no evidence that petitioner's church existed prior to December, 1975. Accordingly, petitioner's earnings for at least 11 months of that year could not have been earned by a church or as agent for a church. Secondly, petitioner's vow of poverty, unlike Mr. McGahen's, was not executed prior to the years in issue, but only in May, 1977. Obviously this vow of poverty could not shift the incidence of taxation retroactively to January 1, 1975. With regard to the question of whether the insurance commission income may be the subject of self-employment tax liability in 1975, 1976 and 1977, we note that petitioner makes no argument that the insurance commissions, if income within the meaning of section 61, are not self-employment income. See section 1402; Simpson v. Commissioner,64 T.C. 974 (1975). Nor has petitioner presented evidence that he filed for exemption from the self-employment tax in those years as an ordained minister, under section 1402(e). It is petitioner's contention, however, that he remains entitled to pay no self-employment *819 taxes on the insurance commissions on the ground that his services were performed as a member of a religious order under a vow of poverty. Under section 1402(c)(4), the performance of service by a duly ordained minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order does not result in the imposition of self-employment tax when either 1) an exemption under section 1402(e) is obtained or 2) the religious order member has taken a vow of poverty.
Respondent argues that petitioners are not exempt from self-employment tax because the vow of poverty Julius Jenny took in May, 1977, was a sham. We agree. For a vow of poverty to be valid for tax purposes both its terms and spirit must be observed. A vow of poverty treated as mere empty words by a taxpayer need not be given greater respect by the Commissioner and the courts. See Kelley v. Commissioner,62 T.C. 131 (1974). In the instant case petitioners have failed to establish any change in their living style subsequent to Mr. Jenny's signing of the vow. Apparently, petitioners continued to enjoy the use of cars, campers and their prior *820 residence unabated. Mr. Jenny kept a will even after he no longer was supposed to be able to hold title to property. Under such circumstances we hold that the vow was of no effect for tax purposes. Moreover, the vow was not executed until May, 1977. No insurance commissions earned by Mr. Jenny prior to that date could in any way be said to be earned by an individual operating under a vow of poverty. For the above reasons, we find that petitioners were liable for self-employment tax on Julius Jenny's insurance commission income in 1975, 1976 and 1977. See Stephenson v. Commissioner,supra.
The next issue for decision is whether petitioners are entitled to various itemized and business expense deductions. The items at issue are as follows: Year
Amount
Deduction
1975
$5,462.78
Total itemized deductions
1975
191.60
Tolls & parking - insurance business
1975
909.10
Auto expense - insurance business
1975
832.25
Promotional and entertainment - insurance business
1975
736.64
Office expense - insurance business
1976
261.40
Medical expense
1976
51.80
Auto rental expense - insurance business
1976
150.00
Legal and professional fees - insurance business
1976
638.10
Promotional and entertainment expense -
insurance business
*821 With regard to the 1975 itemized deductions claimed on the defective 1975 amended joint return, respondent argues that petitioners have not shown these items to have been incurred on behalf of Julius Jenny. Since petitioners introduced no evidence on this subject, they have failed to meet their burden of proof. Rule 142(a). Accordingly, no itemized deductions are allowable in a reconstructed 1975 separate return for Julius Jenny. With regard to the $191.60 tolls and parking expense deductions for 1975 and the $51.80 auto rental expense deduction for 1976, respondent argues that petitioners erroneously deducted these sums twice. This contention is borne out by an examination of petitioners' Forms 1040. Consequently, respondent's disallowance of these items is sustained. With regard to the 1976 $150 legal and professional fees expense, respondent argues that petitioners have not shown this item to be an ordinary and necessary business expense. Petitioners having failed to show the purpose of this expenditure, we hold for respondent. With regard to the 1976 $261.40 downward adjustment of their medical expense deduction, respondent argues this adjustment was necessary both *822 to correct a mathematical error and because of an upward adjustment in petitioners' adjusted gross income. Once again, in the absence of evidence or argument to the contrary, respondent's determination is sustained. Finally, in regard to all of the remaining 1975 and 1976 deductions noted above, petitioners have been precluded from introducing substantiating evidence as a sanction under Rule 104 for petitioners' failure to property answer respondent's interrogatories concerning those items. Absent any substantiating evidence, petitioners have failed to meet their burden of proof as to these remaining items. Rule 142(a). In 1975 and 1976, petitioners operated a dog kennel named Fur N' Feather and claimed losses of $3,943.35 and $5,178.91, respectively, attributable thereto. Although petitioners failed to respond properly to respondent's interrogatories concerning the kennel's income and expenses in those years and as a Rule 104 sanction we have precluded petitioners from offering evidence on that subject, respondent on brief does not rest his attack on the kennel's loss deductions on the grounds of substantiation. Rather, respondent argues that the kennel was not an activity *823 engaged in for profit within the meaning of section 183(a), and that therefore, even if properly substantiated, the claimed losses would be disallowed. [5] To the contrary, petitioners argue they ran the kennel as a business and accordingly its losses should be deductible. In determining whether an activity is one engaged in for profit within the meaning of section 183, our ultimate goal is to determine whether the taxpayers engaged in the activity with an actual and honest profit objective. Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), on remand from 665 F.2d 1292 (D.C. Cir. 1981), revg. and remanding T.C. Memo. 1979-395. Whether the activity, viewed objectively, could reasonably be expected to make a profit is not the ultimate test. Dreicer v. Commissioner,78 T.C. at 644-645. *824 Often this Court is faced with a situation wherein the taxpayer many years after the fact testifies that he intended to make a profit in the challenged activity.Not being bound by such testimony, we then inquire into various objective criteria to reach a conclusion as to the true subjective intent of the taxpayer at the time he engaged in the activity. See section 1.183-2(b), Income Tax Regs. Although various objective factors are considered, no one factor is alone determinative, and the question of intent is determined on the basis of all the facts and circumstances. Section 1.183-2(a), Income Tax Regs.; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Allen v. Commissioner,72 T.C. 28, 34 (1979). In the instant case we are faced with the unusual situation where both petitioners have testified that their main monetary goal in engaging in the activity was to make it financially self-sustaining -- i.e., that they desired neither profits nor losses from their kennel operation. [6] We think this testimony alone would entitle us to find that the Fur N' Feather Kennel was not entered into or operated with an actual and honest profit objective. However, *825 we do not rest our decision on this testimony alone. An examination of objective criteria confirms that petitioners did not engage in the kennel activity with the goal of making a profit.
Section 1.183-2(b), Income Tax Regs. lists nine relevant objective factors which are to be considered in such a determination: 1) the manner in which the taxpayer carries on the activity; 2) the expertise of the taxpayer or his advisors; 3) the time and effort expended by the taxpayer in carrying on the activity; 4) the expectation *826 that assets used in the activity may appreciate; 5) the success of the taxpayer in carrying on other similar or dissimilar activities; 6) the taxpayer's history of income or losses with respect to the activity; 7) the amount of occasional profits, if any, earned; 8) the financial status of the taxpayer; and 9) whether elements of personal pleasure or recreation inhere in the activity. With regard to the manner in which the kennel activity was carried on, we note that the kennel did advertise, [7] kept small ledger books and maintained a separate checking account. Each of these things might suggest that the kennel was more than a hobby. On the other hand, petitioners did not uniformly charge their customers for grooming and boarding services. More importantly, petitioners incurred expenses connected with showing their kennel-bred dogs in 1975 and 1976 which alone exceeded the kennel's gross receipts those years. These show expenses could never be recouped by the small prizes for which petitioners entered their dogs and in fact no prizes were ever awarded to petitioners' dogs, in those years. The incurring *827 of such expenses as part of the kennel activity suggests strongly that petitioners did not maintain the kennel as a profit-making activity. In regard to petitioners' expertise in the kennel field, we have found that Mrs. Jenny took several educational courses regarding the care of animals. We do not know, however, the extent to which these courses related to dogs. (Mrs. Jenny also testified she had an interest in horses.) Nor do we know whether these courses had any practical relevance to the operation of a kennel. Consequently, we cannot find that petitioners were in any way expert in the kennel field. The testimony with regard to petitioners' time and effort devoted to the kennel was rather conclusory. Mrs. Jenny stated she worked with the dogs "day and night." We somewhat doubt this testimony, however, to the extent it implies Mrs. Jenny spent all her waking hours with the dogs (as opposed to merely feeding them and being "on call" all day). In 1975 and 1976, Mr. Jenny was working apparently full-time in his insurance business and Mrs. Jenny was raising three minor children. While we are satisfied the dogs did require a certain amount of attention, having no evidence as *828 to how many dogs were cared for and how long each dog stayed with petitioners, we cannot estimate the time and effort the kennel activity actually consumed. The remaining factors may be summarily discussed: First, it is clear that the kennel had no assets likely to appreciate in value. Second, the Jennys had never before operated a kennel and made no inquiries into the profitability of such an activity. Third, they experienced continuous losses and never made a profit. Fourth, petitioners did not rely on the kennel as a source of income for their livelihood, but rather relied on Mr. Jenny's insurance activities and trust distributions. Finally, there was a very high degree of personal pleasure or, at least, satisfaction connected with this activity as far as the Jennys were concerned. The above objective criteria on the whole tend to corroborate petitioners' own testimony that the kennel was run overall more with a benevolent rather than profit-making objective. Additionally, the above facts indicate the use of the kennel by the Jennys to further their own hobby of being dog lovers and owners (see, e.g., the show expenses). On the facts and circumstances presented, we *829 conclude that petitioners did not possess an actual and honest profit objective with regard to the kennel in 1975 and 1976. Dreicer v. Commissioner,supra.Accordingly, the losses from the kennel operation are not deductible in those years. The next issue is whether petitioners have substantiated $1,000 capital loss carryover deductions they claimed both in 1975 and 1976. Petitioners argue that these loss carryovers derive from a loan in excess of $36,000 which they made to Dick Jenny Dodge, Inc., sometime prior to 1965. The loan, according to petitioners, went bad in 1968 and since that time they have yearly claimed a portion of that loan as a bad debt capital loss carryover. We do not find this testimony sufficient on its own to entitle petitioners to the 1975 and 1976 deductions at issue here. Petitioners have introduced no evidence beyond their own testimony to establish either 1) the fact of the loan, 2) the precise amount of the loan or 3) the worth-lessness of the loan. (According to petitioners, Dick Jenny Dodge, Inc. did not go through bankruptcy.) Nor have petitioners introduced any evidence to show that the loss carry-over, if any, was still *830 available for use in 1975 and 1976 and was not consumed totally prior to those years. On this record, petitioners have failed to meet their burden of proof on these items and they are therefore not deductible. The sixth major issue in this case concerns whether petitioner Julius Jenny was required to report as income one-half of the trust distributions he and his wife received from the Erwin J. Hainisch Trust in 1975 and 1977. At trial, Julius Jenny vigorously disputed the fact that he was a beneficiary of his uncle's trust. He argued that the bank, acting as trustee, was wrong when it named him a co-beneficiary with his wife in a 1976 letter. Jenny contended his wife was sole beneficiary. He did not, however, produce a copy of the trust instrument. It appears that Jenny has now conceded this issue in his reply brief, but lest there be a question on this issue we find that on the record presented Jenny was a beneficiary required to report one-half of the trust distributions he and his wife received in 1975 and 1977. The seventh issue is whether in 1976 petitioners properly deducted $7,250 (roughly one-half their adjusted gross income) as a charitable contribution to their *831 church. Respondent disallowed this deduction on the grounds that petitioners have not substantiated any such contribution and, in any event, the contribution was not made to an organization meeting the requirements of section 170(c)(2). In particular, respondent argues that petitioners' church was not operated exclusively for charitable purposes (see section 170(c)(2)(B)) and part of its net earnings inured to the benefit of private individuals, namely petitioners (see section 170(c)(2)(C)). We dealt with this same issue in McGahen v. Commissioner,supra, where the taxpayer, another Basic Bible minister, claimed a charitable deduction to his church in the full amount of his reported income. All of that income had been deposited in the church's checking account and most of the funds in the account had been withdrawn by the taxpayer to pay his family's personal living expenses.We there held that the taxpayer was entitled to no charitable deduction because the net earnings of the taxpayer's chapter of the Basic Bible Church inured to the benefit of private individuals -- i.e., the taxpayer and his family. 76 T.C. at 482-483. The facts in the instant *832 case are on all fours with the facts in McGahen. Accordingly, and for the reason stated in McGahen, petitioners are entitled to no charitable deduction in 1976 for alleged contributions to their Basic Bible Church chapter. [8] See also Stephenson v. Commissioner,supra.
The next issue is whether Julius Jenny is liable for the additions to tax for fraud in each of the years 1975, 1976 and 1977. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. by unpublished order 578 F.2d 1383 (8th Cir. 1978). Respondent bears the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). To prove fraud, respondent must show that the taxpayer acted with specific intent to evade a tax believed to be owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968). Fraud may not be presumed or imputed; however, since direct evidence of fraud is seldom available, respondent *833 may meet his burden of proof through circumstantial evidence. Stone v. Commissioner,56 T.C. 213, 224 (1971). For many years prior to 1975, Julius Jenny had filed complete and detailed income tax returns. Suddenly, in 1975, he chose not to file returns disclosing his income and deductions. Instead, with the alleged goal of protesting the Federal government's funding of abortion, he filed a 154-page package of documents attached to an incompletely filled-out Form 1040. The Form 1040 did not contain the information necessary for respondent to be able to calculate Jenny's true tax liability. It did, however, contain notations raising assorted constitutional arguments and arguments that Federal Reserve Notes were not lawful money. From a review of both these documents and Jenny's testimony at the trial, we conclude that Jenny did not believe that these constitutional and lawful-money arguments were effective to relieve him of any tax liability or duty to file informative returns in 1975. In particular, we note that the documents themselves contain both the text, citation and summaries of various cases, including Jerome Daly's criminal conviction for filing similar *834 returns and an Internal Revenue Service memorandum stating that this type of return was considered unacceptable by the government and citing taxpayers generally to United States v. Porth,426 F.2d 519 (10th Cir. 1970).Although some of these documents were apparently purchased in a prepackaged form, many were not. Jenny supplemented the prepackaged documents with his own. He also typed his own comments on the prepackaged documents, showing that he had read them carefully. At the trial we found Julius Jenny to be extremely knowledgeable in the tax area, being quite familiar with such things as the organizational, operational and non-inurement requirements of section 501(c)(3) organizations and the tax on unrelated business taxable income applicable to such organizations. It appears he never really took the constitutional arguments in his 1975 purported tax return seriously.(For example, he did not pursue such arguments at the instant trial and made no effort to explain the aforementioned documents.) We believe he knew he was obligated to pay tax in 1975 and simply chose not to as a way of protesting abortion. His use of the constitutional and Federal Reserve Notes *835 arguments were mere devices he employed to make it difficult for the government to ascertain his true income and seek from him the taxes owing. These were devices used to conceal his true motives and income. See Spies v. United States,317 U.S. 492 (1943); Habersham-Bey v. Commissioner,78 T.C. 304 (1982). Jenny's lack of cooperation with the investigating agents coupled with his obstructive responses to some of respondent's interrogatories relating to 1975 is further evidence of fraudulent intent as to that tax year. Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); Grosshandler v. Commissioner,75 T.C. 1, 19-20 (1980). In sum, we think the evidence in this case amply supports a finding of fraud as to the year 1975. In addition to a finding of fraud, however, there must also be an underpayment relating thereto. [9] This requires us to explore the ramifications of petitioners' purported amended joint return for 1975. *836 As discussed above, petitioners did not make an effective joint return election for 1975. Respondent, though, is willing to consider the defective 1975 joint return as a late-filed individual return for petitioner Julius Jenny. Petitioner does not benefit, however, regardless of whether this return is considered a late-filed original return, an amendment of an initially fraudulent return, or no return. For purposes of determining whether there is an underpayment within the meaning of section 6653(b), we are only to look at income, deductions and credits that were reported on timely filed original returns.Section 6653(c)(1); Levinson v. United States,496 F.2d 651 (3d Cir. 1974); Papa v. Commissioner,464 F.2d 150 (2d Cir. 1972), revg. a Memorandum Opinion of this Court; Stewart v. Commissioner,66 T.C. 54 (1976); Breman v. Commissioner,66 T.C. 61 (1976). Since no amount of income was shown on a timely filed original 1975 return in this case, the entire deficiency at issue here constitutes an underpayment. Consequently, the section 6653(b) addition as to 1975 must be imposed. With regard to the 1976 tax year, *837 Julius Jenny's fraudulent act, according to respondent, was taking a deduction of one-half of adjusted gross income as a charitable contribution to the church. In McGahen v. Commissioner,supra, the taking of a similar deduction by a Basic Bible Church minister was held to constitute negligence or intentional disregard of rules and regulations under section 6653(a). Although in McGahen respondent did not seek a fraud addition under section 6653(b), we there noted that "the facts * * * might justify the imposition of additions to tax under section 6653(b) * * *." 76 T.C. at 483. [10]
In the instant case we think the facts do justify the fraud addition. At trial, petitioner demonstrated an extensive familiarity with the various rules of sections 170 and 501(c)(3). Both at trial and during the 1976 tax year he was familiar with the organizational, operational and, most importantly, non-inurement requirements of those sections. We can only conclude that petitioner knew that the monies, if any, he contributed to his church were inuring to his own and his family's *838 benefit and therefore knew his charitable deduction was improper. Additionally, we are satisfied petitioner was not duped by Jerome Daly into taking this deduction. Petitioner knew of Daly's criminal tax conviction, having learned of this in the course of researching the documents attached to his initial 1975 Form 1040. We do not believe a different result is required by Raley v. Commissioner,676 F.2d 980 (3d Cir. 1982), revg. T.C. Memo. 1980-571. The facts recited by the Circuit Court in Raley indicate that the taxpayer in that case filed a W-4E (Exemption from Withholding) form with his employer, United States Steel, claiming that he had not incurred any federal income tax liability during the immediately prior year and that he did not anticipate any such liability for the current year.This representation was untrue. At some point he filed purported amended returns which were devoid of any information concerning his income and which falsely indicated that they were amending prior returns. To meet its burden of proving fraud the government in Raley relied upon the foregoing facts as well as the taxpayer's actions in refusing to sign *839 his income tax returns under penalty of perjury and his refusal to provide the IRS with any information in order that the IRS might compute the proper tax liability. As we have previously discussed, in the case before us Julius Jenny's continuing course of deliberately evasive conduct amply demonstrates his intentional wrongdoing motivated by a specific purpose to evade a tax known or believed by him to be owing. Stoltzfus v. United States,398 F.2d 1003, 1004 (3d Cir. 1968). In Raley, the Circuit Court stated that "were [the evidence upon which the government relied to prove fraud] the only evidence before us, we might be inclined to agree with the Government * * *." The Court then pointed out, however, that Raley, the taxpayer, wrote many letters to various federal officials (among whom were the Secretary of the Treasury), in which he went out of his way to inform every person involved in the collection process that he was not going to pay any federal income taxes. The Court held that "[i]t would be anomalous to suggest that Raley's numerous attempts to notify the Government are supportive, let alone suggestive, of an attempt to defraud." Cf. United States v. Pomponio,429 U.S. 10, 12 (1976); *840 United States v. Afflerbach,547 F.2d 522, 524 (10th Cir. 1976).Since we do not have such a pattern of notification in the case before us, we therefore believe this case to be distinguishable from Raley, and that the respondent has, in fact, proved fraud. Stephenson v. Commissioner,supra.
Accordingly, we uphold the fraud addition as to the 1976 taxable year. With regard to 1977, petitioner once again changed his method of misreporting his income. As discussed previously, in May, 1977, Julius Jenny executed a document purporting to be a vow of poverty. As a consequence of his vow, Jenny maintains, he was not liable for income or self-employment taxes in 1977; therefore he included no meaningful income information on the Form 1040 which he filed for that year. This Court has on numerous occasions found such spurious vows of poverty to be ineffective to shift the incidence of taxation. [11] Neither do we believe that petitioner thought it effective to retroactively shift the incidence of taxation in 1977. *841 We think it significant that the 1977 Form 1040 contained even less income information than the 1975 document. In addition, when respondent's agents later sought to determine petitioner's true income and expenses for 1977, petitioner continued even more vigorously than before to resist disclosure. See Powell v. Granquist,supra;Grosshandler v. Commissioner,supra.Had petitioner honestly believed he was exempt from income taxes due to his vow of poverty, he would have had little reason to resist proper inquiries from respondent. Petitioner's only explanation as to why he would not reveal to respondent the 1977 income information was that he personally was a church and that his documents were therefore church records exempt from examination under section 7605(c). [12] We think this argument disingenuous. *842 Petitioner was quite familiar with the tax on unrelated business taxable income and in fact has attempted to portray his kennel activity as an integral function of his church and not an unrelated trade or business. Section 7605(c) explicitly provides that a church may, with certain limitations, be examined for the purpose of ascertaining whether it is operating an unrelated trade or business and, as the Ninth Circuit has recently expressly held, in no way limits an inquiry as to whether it is in fact a church. United States v. Coates,692 F.2d 629 (9th Cir. 1982). Accordingly, petitioner's argument that section 7605(c) barred respondent's inquiries is specious. See also United States v. Freedom Church,613 F.2d 316, 323-324 (1st Cir. 1979). [13]
In addition, petitioner's behavior -- i.e., being less cooperative regarding the church for *843 the 1977 tax year than for the 1976 tax year -- cannot be explained simply by reference to section 7605(c). The more logical explanation for petitioner's conduct is that he desired to conceal his true income from respondent for the 1977 taxable year in an effort to thwart the lawful collection of taxes. The vow of poverty, we think, was simply a device chosen to slow down and hopefully confuse respondent in that effort. The 1977 Form 1040 was not the product of a bona fide belief that no taxes were owing. Accordingly, we hold that the addition to tax under section 6653(b) is properly imposed for 1977. [14]
The next issue is whether Mrs. Jenny is liable for the fraud addition for the taxable year 1976. Prior to 1975, Mrs. Jenny had regularly filed timely joint income tax returns with her husband. For the taxable year 1975, however, she filed an individual return, not wishing to join in the protest document her husband filed as his return for that year. From these *844 facts we can infer that Mrs. Jenny had some knowledge of what was and what was not an acceptable tax return. For 1976, Mrs. Jenny signed her name to a joint return with her husband which claimed, among other things, a $7,250 charitable contribution deduction to the Life Science Church of Darlington. Prior to signing this return, Mrs. Jenny discussed with her husband the correctness of taking such a deduction. At the trial we found Mrs. Jenny to be an intelligent women. Her knowledge of the tax laws, particularly those relating to exempt organizations, however, was not explored by the respondent. Nor did respondent explore the exact nature of what Mrs. Jenny was told by her husband with regard to the $7,250 deduction. [15] Although the issue is by no means free from doubt, we find that respondent has failed to show by clear and convincing evidence that Mrs. Jenny knew that the disputed charitable deduction was in fact improper. Consequently, we decline to uphold the fraud addition as to Mrs. Jenny. *845 The penultimate issue is whether petitioner Julius Jenny is liable for the additions to tax under section 6654 for failure to make timely estimated tax payments in 1975 and 1977. The section 6654 addition to tax is mandatory unless the petitioner can place himself within one of the computational exceptions provided for in subsection (d) thereof. Grosshandler v. Commissioner,supra at 20-21."This section has no provision relating to reasonable cause and lack of wilful neglect. It is mandatory and extenuating circumstances are irrelevant." Estate of Ruben v. Commissioner,33 T.C. 1071, 1072 (1960). Petitioner does not fall within any of the computational exceptions; consequently, the additions are sustained.
Finally, petitioners request costs in this action. This Court has no authority to award such costs to petitioners. McQuiston v. Commissioner,78 T.C. 807 (1982), on appeal (9th Cir., Aug. 17, 1982). [16]
*846 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
2. The deficiencies and additions for the taxable years 1975 and 1977 relate to petitioner Julius R. Jenny only.↩
3. The following is an example of the questions, answers and the Court's rulings thereon: THE COURT: Number eleven states, "Please state the amounts which you spent on the following items for you and your family during each of the years, 1976, and 1977: A, rent or mortgage payments including interest; b, groceries and outside meals; c, utilities, electricity, heat, telephone, water, sewerage; d, clothing; e, laundry and dry cleaning; f, beauty shop and cosmetics; g, auto payments; h, gasoline and so forth; i, dues, union club, lodge, and so forth; j, recreation, entertainment and vacations; k, medical expenses; 1, taxes; m, insurance; n, repairs to home or motor vehicles; o, education, tuition and so forth; p, contributions." His [petitioner's] answer: "Object to this interrogatory as in direct violation of the US Code 26 Section 7605 (c) and Petitioners demand Respondent comply with their own rules and regulations concerning that section." The Petitioners have failed to properly respond and the Petitioners will be precluded from introducing evidence on these items. See also footnote 13, infra.↩
3a. (b) JOINT RETURN AFTER FILING SEPARATE RETURN.-- (1) IN GENERAL.--Except as provided in paragraph (2), if an individual has filed a separate return for a taxable year for which a joint return could have been made by him and his spouse under subsection (a) and the time prescribed by law for filing the return for such taxable year has expired, such individual and his spouse may nevertheless make a joint return for such taxable year. A joint return filed by the husband and wife under this subsection shall constitute the return of the husband and wife for such taxable year and all payments, credits, refunds, or other repayments made or allowed with respect to the separate return of either spouse for such taxable year shall be taken into account in determining the extent to which the tax based upon the joint return has been paid. If a joint return is made under this subsection, any election (other than the election to file a separate return) made by either spouse in his separate return for such taxable year with respect to the treatment of any income, deduction, or credit of such spouse shall not be changed in the making of the joint return where such election would have been irrevocable if the joint return had not been made. If a joint return is made under this subsection after the death of either spouse, such return with respect to the decedent can be made only by his executor or administrator. (2) LIMITATIONS FOR MAKING OF ELECTION.--The election provided for in paragraph (1) may not be made-- (A) unless there is paid in full at or before the time of the filing of the joint return the amount shown as tax upon such joint return; or (B) after the expiration of 3 years from the last date prescribed by law for filing the return for such taxable year (determined without regard to any extension of time granted to either spouse); or (C) after there has been mailed to either spouse, with respect to such taxable year, a notice of deficiency under section 6212, if the spouse, as to such notice, files a petition with the Tax Court within the time prescribed in section 6213; or (D) after either spouse has commenced a suit in any court for the recovery of any part of the tax for such taxable year; or (E) after either spouse has entered into a closing agreement under section 7121 with respect to such taxable year, or after any civil or criminal case arising against either spouse with respect to such taxable year has been compromised under section 7122.↩
4. We make this holding for all three years before us, notwithstanding the fact that in 1976 petitioners did include all Julius Jenny's insurance commissions and prizes in income. It is unclear from petitioner's briefs whether they have repudiated their 1976 reporting position. With regard to 1975, respondent argues that the purported amended return on which petitioners reported all insurance commissions and prizes as income constitutes an admission that such amounts were income to Julius Jenny that year. In their petition, petitioners attempted to repudiate this return.Since we hold that these amounts were taxable income to Julius Jenny in 1975, we need not decide the effect of the belated reporting and attempted repudiation of such reporting.↩
5. Section 183(a) provides: (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.↩
6. The apparent motive for such testimony is petitioners' argument that the kennel was run as one of the church's section 501(c)(3) activities - i.e., "the prevention of cruelty to * * * animals." -- and not as a profit-making venture. On this record, however, we cannot conclude that the kennel was an activity of the church in 1975 (when for 11 months the church did not exist) or 1976 (when on their return petitioners treated the kennel's losses as their own, not the church's). Had the kennel in fact been an activityof the church, only the church, and not petitioners, would be entitled to claim the kennel's loss deductions. Petitioners' arguments are thus inconsistent.↩
7. See McLarney v. Commissioner,T.C. Memo. 1982-461↩.
8. As in McGahen,↩ we do not here reach respondent's alternative arguments for disallowing the charitable deduction.
9. Section 6653(b) and (c) provide, in relevant part: (b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to tax an amount equal to 50 percent of the underpayment. * * * (c) DEFINITION OF UNDERAYMENT.--For purposes of this section, the term "underpayment" means-- (1) INCOME, ESTATE, GIFT, AND CERTAIN EXCISE TAXES.--In the case of a tax to which section 6211 (relating to income, estate, gift, and certain excise taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing), * * *↩
10. See also Minckler v. Commissioner,T.C. Memo. 1981-343↩.
11. See, e.g., McGahen v. Commissioner,76 T.C. 468 (1981); Minkler v. Commissioner,T.C. Memo. 1981-343; Young v. Commissioner,T.C. Memo. 1981-109, affd. per order (7th Cir., Dec. 7, 1981); Lysiak v. Commissioner,T.C. Memo. 1981-108↩.
12. Section 7605(c) provides: (c) RESTRICTION ON EXAMINATION OF CHURCHES.--No examination of the books of account of a church or convention or association of churches shall be made to determine whether such organization may be engaged in the carrying on of an unrelated trade or business or may be otherwise engaged in activities which may be subject to tax under part III of subchapter F of chapter 1 of this title (sec. 511 and following, relating to taxation of business income of exempt organizations) unless the Secretary (such officer being no lower than a principal internal revenue officer for an internal revenue region) believes that such organization may be so engaged and so notifies the organization in advance of the examination. No examination of the religious activities of such an organization shall be made except to the extent necessary to determine whether such organization is a church or a convention or association of churches, and no examination of the books of account of such an organization shall be made other than to the extent necessary to determine the amount of tax imposed by this title.↩
13. Although some of the information respondent sought may have been privileged, see Baldwin v. Commissioner,648 F.2d 483↩ (8th Cir. 1981), vacating and remanding an unpublished order of this Court, the vast majority of such information -- primarily financial in nature -- clearly was not.
14. Having found fraud in both the 1975 and 1977 tax years, we need not reach respondent's alternative assertion of additions to tax under sections 6653(a) and 6651(a) as to Julius Jenny for those years.↩
15. In addition, we note that Mrs. Jenny was not present when respondent's agents audited the 1976 return. We do not think it fair, therefore, to impute Julius Jenny's resistence to respondent's inquiries as to that year (and other years pertaining only to Julius) to Mrs. Jenny.↩
16. Section 7430, as amended by section 292 of the Tax Equity and Fiscal Responsibility Act of 1982, 96 Stat. 572, which authorizes this Court to award taxpayers costs and certain fees, is not applicable to actions commenced before March 1, 1983.↩